# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

_____

CASE NO.: 13-14350-AA

_____

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

v.

FRANK RUSSELL MCCOY,
DEFENDANT-APPELLANT.

_____

## PRINCIPAL BRIEF OF THE APPELLANT

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION
CASE NO.: 1:07-CR-00018-WLS-TQL-1

_____

Martin J. Vogelbaum
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 207-3443
Fax: (478) 207-3419
E-mail: martin_vogelbaum@fd.org
Appellate Counsel for Mr. McCoy

## *AMENDED* CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned appellate counsel of record for Defendant-Appellant, Mr. McCoy, in compliance with Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, certifies that the following listed persons and parties have an interest in the outcome of this case:

### Parties:

McCoy, Frank Russell, Defendant-Appellant;

United States of America, Plaintiff-Appellee;

### Judges:

Hodge, Richard L., *Retired* United States Magistrate Judge, Middle District of Georgia;

Langstaff, Thomas Q., United States Magistrate Judge, Middle District of Georgia;

Sands, W. Louis, United States District Judge, Middle District of Georgia;

### Attorneys:

Crane, James N., Trial Attorney for Plaintiff-Appellee, United States of America, Assistant United States Attorney for the Middle District of Georgia;

Fakhimi, Morad, Trial Attorney Defendant- Appellant, Mr. McCoy,

*Former* Assistant Federal Defender for the Federal Defenders

of the Middle District of Georgia, Inc.;

Febus, Chantel L., Trial Attorney for Plaintiff-Appellee, United States

of America, Assistant United States Attorney;

Glassroth, Stephen R., Trial Attorney Defendant- Appellant, Mr.

McCoy, *Former* Executive Director for the Federal Defenders

of the Middle District of Georgia, Inc.;

Hunt, Christina, Interim Executive Director/Senior Litigators for the

Federal Defenders of the Middle District of Georgia, Inc.;

King, Damon, Trial Attorney for Plaintiff-Appellee, United States of

America, Assistant United States Attorney;

Moore, Michael, United States Attorney, Middle District of Georgia;

Pellettieri, John Michael, Appellate Attorney for Plaintiff-Appellee,

United States of America, U.S. Department of Justice;

Pratt, Sherease Rosalyn, Trial Attorney for Plaintiff-Appellee, United

States of America, Assistant United States Attorney;

Roseberry, Cynthia W., Trial Attorney for Defendant-Appellant, Mr.

McCoy, *Former* Executive Director for the Federal Defenders

of the Middle District of Georgia, Inc.;

Vogelbaum, Martin J., Appellate Attorney for Defendant-Appellant, Mr. McCoy, Research & Writing Attorney for the Federal Defenders of the Middle District of Georgia, Inc.; and,

Williams, Catherine M., Trial Attorney for Defendant-Appellant, Mr. McCoy, Assistant Federal Defender for the Federal Defenders of the Middle District of Georgia, Inc.

**STATEMENT REGARDING ORAL ARGUMENT**

Frank McCoy requests oral argument. This case presents unusual and important questions concerning the proper application of the test for legal obscenity set out in *Miller v. California*, 413 U.S. 15 (1973). Specifically, it requires this Court to determine how the "work as a whole" should be identified and defined for *Miller* purposes, and to what extent circumstantial evidence of an author's intentions may be considered in judging the legal obscenity of his work. Given the novelty of these issues and their centrality to First Amendment jurisprudence, oral argument will be an important aid to this Court's decisional process.

# TABLE OF CONTENTS

*AMENDED* CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................ C1 of 3

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF CONTENTS........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. v

TABLE OF RECORD REFERNECES .............................................................. viii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

STATEMENT OF THE ISSUES...........................................................................2

      I.     THE DISTRICT COURT FAILED TO JUDGE FRANK MCCOY'S WORK AS A WHOLE. ........................................................................2

      II.    THE DISTRICT COURT MISAPPLIED THE *MILLER* TEST. .........2

      III.   THE DISTRICT COURT CONSTRUCTIVELY AMENDED THE INDICTMENT. ........................................................................................2

      IV.   FRANK MCCOY'S WORK, CONSIDERED AS A WHOLE, POSSESSES SERIOUS LITERARY, ARTISTIC, AND POLITICAL VALUE............................................................................................2

STATEMENT OF THE CASE................................................................................3

  COURSE OF PROCEEDINGS AND DISPOSITION .........................................3

  STATEMENT OF THE FACTS .............................................................................4

  STANDARDS AND SCOPES OF REVIEW .....................................................23

SUMMARY OF ARGUMENT .............................................................................24

      I.     The district court's charge was to evaluate McCoy's work as a whole to judge its obscenity. Yet, although it ultimately concluded that

McCoy's stories, as a whole, are obscene, it reached that conclusion by using 18 of them, chosen by the government, as proxies for the rest. ...................................................................................24

II.    The district court found that the record was devoid of any intent by McCoy to create a work of artistic, literary and political value. That finding was erroneous. Expert testimony on McCoy's behalf, as well as his writings themselves and his statements to police, all showed his serious artistic, literary, and political purpose. ...................................24

III.    The single count indictment charged McCoy with aiding the downloading into the Middle District of Georgia all of his "obscene fantasy stories" in bulk. McCoy had a right to be tried on that allegation by the grand jury. But, by judging only 18 of McCoy's stories, the district court amended the terms of the charge, and McCoy was tried for an offense distinct from the one in the indictment. .......25

IV.    The entirety of the government's evidence of obscenity in this case consists of McCoy's stories themselves. McCoy presented detailed testimony from a distinguished academic that his work does possess serious artistic, literary, and political value. By declining to present any affirmative evidence to counter the evidence of artistic and political value introduced by McCoy, the government failed to carry its burden of proving his work – which, as a whole, is not in fact obscene – violated the statute. ............................................................25

ARGUMENT ...................................................................................27

I.    THE DISTRICT COURT FAILED TO JUDGE FRANK MCCOY'S WORK AS A WHOLE. ....................................................27
    A.    Standard of Review ................................................................27
    B.    Frank McCoy's Webpage was his "Work as a Whole." ...........27

II.    THE DISTRICT COURT MISAPPLIED THE *MILLER* TEST. .......36
    A.    Standard of Review ................................................................37
    B.    The District Court Mistakenly Privileged Frank McCoy's Purpose as the "Most Important" Indicator of the Legal Obscenity of his Work. ............................................................37

iii

III.    THE DISTRICT COURT CONSTRUCTIVELY AMENDED THE
         INDICTMENT. ...................................................................................40
         A.    Standard of Review...............................................................40
         B.    The Indictment Charged That McCoy's Stories, as a Whole,
               Were Obscene. ......................................................................40

IV.    FRANK MCCOY'S WRITINGS, CONSIDERED AS A WHOLE,
         POSSESS SERIOUS LITERARY, ARTISTIC, OR POLITICAL
         VALUE..................................................................................................43
         A.    Standard of Review...............................................................43
         B.    The Government Failed to Overcome Uncontroverted Evidence
               of the Serious Artistic, Literary, and Political Value of
               McCoy's Work.......................................................................44

CONCLUSION .................................................................................................48

CERTIFICATE OF COMPLIANCE..................................................................49

CERTIFICATE OF SERVICE ..........................................................................50

iv

## TABLE OF AUTHORITIES
### CASES

*Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981)........................30

*Ginzburg v. United States*, 383 U.S. 463 (1966) ........................................ 30, 38, 44

*Jenkins v. Georgia*, 418 U.S. 153 (1974).................................................................39

*Kois v. Wisconsin*, 408 U.S. 229 (1972) ...............................................................35

*Luke Records, Inc. v. Navarro*, 960 F.2d 134 (11th Cir. 1992)........................ 46, 47

*Miller v. California*, 413 U.S. 15 (1973) .. i, 2, 25, 27, 28, 29, 30, 37, 38, 39, 41, 43, 46

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56 (1973) ........................................44

*Penthouse International, Ltd. v. McAuliffe*, 454 F.Supp. 289 (N.D. Georgia 1978) ...................................................................................................................31

*Penthouse International, Ltd. v. McAuliffe*, 610 F.2d 1353 (5th Cir. 1980) ... 30, 31, 35

*Skyywalker Records, Inc. v. Navarro*, 739 F.Supp. 578 (S.D. Florida 1990)..........31

*United States v. Andrews*, 850 F.2d 1557 (11th Cir. 1988)....................................40

*United States v. Bagnell*, 679 F.2d 826 (11th Cir. 1982)...................... 27, 29, 37, 43

*United States v. Behety*, 32 F.3d 503 (11th Cir. 1994) ...................................... 40, 42

*United States v. Extreme Associates,* 2009 WL 113767 (W.D. Pennsylvania 2009) .............................................................................................................. 35, 36

*United States v. Madden*, 733 F.3d 1314 (11th Cir. 2013).....................................42

*United States v. Narog*, 372 F.3d 1243 (11th Cir. 2004)........................................43

*United States v. Salinas*, 654 F.2d 319 (5th Cir. Unit A 1981) ...............................40

*United States v. Thevis*, 484 F.2d 1149 (5th Cir. 1973).............................. 31, 33, 35

*United States v. Thevis*, 526 F.2d 989 (5th Cir. 1976)..............................................35

*United States v. Torkington*, 874 F.2d 1441 (11th Cir. 1989) .................................36

*United States v. Weissman*, 899 F.2d 1111 (11th Cir. 1990)........................... 42, 43

## STATUTES

18 U.S.C. § 1462.........................................................................................3, 41

18 U.S.C. § 3231...............................................................................................1

18 U.S.C. § 3742(a) .........................................................................................1

28 U.S.C. § 1291...............................................................................................1

## RULES OF COURT AND PROCEDURE

11th Cir. R. 26.1-1 ..................................................................... C1 of 3

11th Cir. R. 32-4 .............................................................................49

Fed. R. App. P. 26.1 .................................................................... C1 of 3

Fed. R. App. P. 28(a)(9)(b) ...........................................................23

Fed. R. App. P. 32(a)(7)(B)(i).......................................................49

Fed. R. App. P. 32(a)(7)(C) ..........................................................49

## MISCELLANEOUS AUTHORITY

"The 120 Days of Sodom and Other Writings," Marquis de Sade, Grove Press
1966.................................................................................................34

Gore Vidal, "United States," Random House 1993.................................34

Harold Brodkey, "Stories in an Almost Classical Mode," Vintage Books 1989 ....34

http://bannedbooks.world.edu/2011/03/20/banned-book-awareness-color-purple-alice-walker/.................................................................................................39

http://en.wikipedia.org/wiki/Zip_%28file_format%29 .............................................6

http://gawker.com/the-bizarre-parent-letter-that-got-invisible-man-banned-1351663124...................................................................................................39

http://www.granta.com/Archive/Issues .................................................................34

http://www.masteringfilm.com/the-controversy-of-children-in-film/.....................39

http://bannedbooks.world.edu/2012/07/15/banned-books-awareness-bastard-out-of-carolina/...............................................................................................39

## TABLE OF RECORD REFERNECES

**Brief Page Number(s):**                                    **Docket Number**

**Vol. 1 of 3**

| Brief Page Number(s) | | Docket Number |
|---|---|---|
| 3, 6, 27, 42 | Indictment | 1 |
| 3, 7, 28 | Government's Trial Brief | 141 |
| 3, 7, 28 | Defendant's Trial Brief | 143 |
| 3, 7, 8, 28 | Government's Response to Defendant's Trial Brief | 144 |
| 3, 21, 28, 45, 46 | Government's Closing Argument | 159 |
| 4, 22, 28, 40, 41 | Defendant's Motion to Preclude Government from Constructively Amending the Indictment | 160 |
| 3, 22, 46 | Defendant's Closing Argument | 161 |
| 4, 28, 41 | Government's Response to Defendant's Motion to Preclude | 162 |
| 3, 22, 45 | Government's Rebuttal Closing Argument | 163 |
| 4, 23, 29, 41 | Defendant's Reply to Government's Response to Motion to Preclude | 164 |
| 4, 23, 29, 33, 35, 37, 38, 39, 41, 42 | Court's Verdict | 171 |
| 1, 4, 23 | Judgment | 189 |

**_Sealed_ Vol. 2 of 3**

| 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 27, 28, 30, 33, 34, 37, 44, 45 | Unredacted Day One Trial Transcript | *Sealed R.E.* |

**_Sealed_ Vol. 3 of 3**

| 18, 19, 20, 21, 31, 32, 34, 37, 44, 45, | Unredacted Day Two Trial Transcript | *Sealed R.E.* |

**STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION**

This is a direct appeal in a criminal case from the August 12, 2013 final judgment of the United States District Court for the Middle District of Georgia, Albany Division. Doc. 189.[1] The district court had jurisdiction under 18 U.S.C. § 3231.  Frank McCoy filed a timely notice of appeal on August 22, 2013. Doc. 192. This Court has jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

_____

[1] The record will generally be cited as "Doc. # at #." The unredacted January 12 and January 13, 2010 trial transcripts (Doc. 165), however, which were filed with this brief as separate volumes of sealed record excerpts, will be cited as "Tr. 1 at #" and "Tr. 2 at #," respectively. The government's trial exhibits will be cited as "G. Ex. #."

1

## STATEMENT OF THE ISSUES

I.      THE DISTRICT COURT FAILED TO JUDGE FRANK MCCOY'S WORK AS A WHOLE.

II.     THE DISTRICT COURT MISAPPLIED THE *MILLER*[2] TEST.

III.    THE DISTRICT COURT CONSTRUCTIVELY AMENDED THE INDICTMENT.

IV.     FRANK MCCOY'S WORK, CONSIDERED AS A WHOLE, POSSESSES SERIOUS LITERARY, ARTISTIC, AND POLITICAL VALUE.

---

[2] *Miller v. California*, 413 U.S. 15 (1973).

## STATEMENT OF THE CASE

This criminal appeal arises from the imposition of a sentence of 18 months imprisonment, two years of supervised release, and a $100 special assessment by Judge W. Louis Sands of the United States District Court for the Middle District of Georgia, Albany Division. Docs. 189.

## COURSE OF PROCEEDINGS AND DISPOSITION

On June 13, 2007 a federal grand jury sitting in the Middle District of Georgia returned a single count indictment charging Frank McCoy with transportation of obscene matters in violation of 18 U.S.C. § 1462. Doc. 1. McCoy pled not guilty on January 23, 2008. Docs. 10 and 12.

The government filed a trial brief on January 7, 2010. Doc. 141. McCoy filed his trial brief on January 8, 2010. Doc. 143. The government filed an additional trial brief on January 10, 2010. Doc. 144. The government and McCoy entered into joint stipulations of fact on January 11, 2010. Docs. 145 and 146.

McCoy's case was tried to the district court over two days. Docs. 149 and 150. The government submitted its written closing argument on January 27, 2010. Doc. 159. McCoy submitted his written closing argument on February 3, 2010. Doc. 161. The government submitted its written rebuttal argument on February 10, 2010. Doc. 163.

3

McCoy filed a "Motion to Preclude the Government from Constructively Amending the Indictment" on February 3, 2010. Doc. 160. The government responded to McCoy's motion on February 10, 2010. Doc. 162.  McCoy replied to the government's response on February 17, 2010. Doc. 164.

The district court rendered a guilty verdict on March 29, 2013. Doc. 171. On July 26, 2013, the district court sentenced McCoy to 18 months imprisonment, two years of supervised release, and a $100 special assessment. Doc. 188. Judgment entered on August 12, 2013. Doc. 189.

McCoy entered a timely notice of appeal on August 22, 2013. Doc. 192. He is incarcerated at the Federal Correctional Institution in Oakdale, Louisiana.

## STATEMENT OF THE FACTS

In 2003, Special Agent Cory Brant was working child exploitation cases for Immigration and Customs Enforcement in Atlanta, Georgia. Tr. 1 at 24-25. In the course of one of those investigations, Brant was alerted to the existence of a website called "young-stuff.com." Tr. 1 at 25-26.

Among the offerings on young-stuff.com was a webpage authored by someone named Frank McCoy. Tr. 1 at 26-29; G. Ex. 1. The webpage commenced with a section entitled, "Who IS this Frank McCoy guy, anyway?" Tr. 1 at 27. The answer to that question:

> Frank McCoy is a man who started writing sex stories for his own enjoyment, and started publishing them on the internet in alt.sex.stories where he found that other people were interested in reading them.
>
> His stories mostly involve incest, family members having sex, pedophilia, young children having sex, pregnancy, yes, having babies, and quite often several other quirks as well. These stories with a few notable exceptions are completely consensual. That means that all parties involved want to do whatever they are doing and are basically love stories.
>
> Even though most people might consider this abuse, nobody, with the above noted exceptions, gets abused in his stories.  If a little girl has sex, gets fucked, it is because she wants to get fucked and asks for it. This may be unrealistic, but these are stories, fantasies, they are not intended of examples of the real world or suggestions of things to do.

Tr. 1 at 27-28. On young-stuff.com, Brant found an email address for McCoy. Tr. 1 at 40.

In 2005, intrigued by McCoy's webpage, Brant, while located in Albany, Georgia, decided to access McCoy's stories. Tr. 1 at 28-29. But, in order to do that, he needed to learn their internet location. Tr. 1 at 41-42. Brant therefore emailed McCoy twice, seeking the internet address of the tales. Tr. 1 at 40-42; G. Ex. 6.

Brant learned that he could view the stories on websites identified in links emailed to him by McCoy, or download them from the websites. Tr. 1 at 29 and 40. On March 22, 2005, Brant elected to download the entirety of McCoy's written corpus into the Middle District of Georgia. Tr. 1 at 30-31; G. Ex. 3. He also asked

5

McCoy to email him a "zip" – or consolidated and compressed[3] – computer file containing all of McCoy's stories. Tr. 1 at 42. McCoy emailed the zip file. Tr. 1 at 42.

Brant contacted McCoy again on March 10, 2006. Tr. 1 at 43; G. Ex. 7. He told McCoy that he was having difficulty locating the websites hosting McCoy's tales. Tr. 1 at 43-44; G. Ex. 7. In response, McCoy emailed Brant links to two websites where his writings were collected. Tr. 1 at 44; G. Ex. 7. On August 8, 2006, Brant again downloaded McCoy's writings from the websites into the Middle District of Georgia. Tr. 1 at 44-45; G. Ex. 9.

Brant sought out and downloaded McCoy's writings into the Middle District of Georgia a third time, on January 29, 2008. Tr. 1 at 47-48; G. Ex. 11.

On June 13, 2007, a federal grand jury sitting in the Middle District of Georgia indicted McCoy for transporting obscene matters into the district between June 23, 2002 and August 8, 2006. Doc. 1. The indictment prompted McCoy's arrest by ICE agents at his home outside of Minneapolis, Minnesota, on January 9, 2008. Tr. 1 at 49 and 54-56. McCoy pled not guilty to the indictment on January 23, 2008. Doc. 12.

On December 29, 2009, McCoy waived his right to a jury trial. Doc. 129. On January 7, 2010, the government filed its "Bench Memorandum." Doc. 141. The

---

[3] http://en.wikipedia.org/wiki/Zip_%28file_format%29.

6

government's memorandum, though noting that Brant had twice downloaded thousands of pages of McCoy's writings into the Middle District of Georgia, proposed that only 18 stories be admitted into evidence. Doc. 141 at 3 and 9; Doc. 208 at 25-26. The government further asked the district court to render a special verdict as to each story. Doc. 141 at 3.

In his "Bench Memorandum and Defendant's Stipulations of Fact," McCoy objected to the government's proposals to enter only a fraction of his work in evidence at trial, and to request 18 separate special verdicts. Doc. 143 at 3-4. He argued that proceeding in this fashion would run afoul of the legal requirement that the obscenity, or not, of McCoy's writings be judged by evaluating them as a whole. Doc. 143 at 3-4. Further, McCoy announced his intention to stipulate to all of the elements of the charge against him except the accusation that his writings were legally "obscene." Doc. 143 at 2-3. He appended factual stipulations to his memorandum. Doc. 143 at 6-9.

In its "Response to Defendant's Bench Memorandum," the government replied that each of McCoy's stories was a whole, discrete work whose legal obscenity could be determined individually. Doc. 144 at 1-5. According to the government, the manner in which McCoy posted, or "held out" the stories on the websites from which they were downloaded demonstrated that each was intended to stand alone. Doc. 144 at 5-9. The government requested the district court

7

approve its plan to enter only 18 stories or, alternatively, asked it to render a special verdict on each of the 276 stories that Brant downloaded into the Middle District of Georgia. Doc. 144 at 8.

On January 11, 2010, McCoy and the government filed "Joint Stipulations of Fact" with the district court, narrowing the trial to the question of whether McCoy's writings were legally obscene. Doc. 145.

Trial commenced on January 12, 2010. Tr. 1. The district court began by addressing the dispute over the legal definition of "work as a whole" as it applied to McCoy's case. Tr. 1 at 11-12. The district court said that it would reserve the issue, granting McCoy a standing objection, until it had seen what evidence the government chose to offer. Tr. 1 at 12. The district court opined that it could not decide what constituted McCoy's "work as a whole" until it had seen all of the admitted evidence. Tr. 1 at 12.

In its opening statement, the government outlined its evidence on the legal obscenity of McCoy's writings:

> To prove that the materials were obscene, the government has to show three things. First, that an average person applying contemporary community standards would find that the materials as a whole appeal to the prurient interest.
>
> You will hear testimony and have for your consideration all the stories that were downloaded from the young-stuff.com… and the ASSTR web site…that describe in explicit and graphic detail the sexual abuse, rape, and torture of very young children. These facts will demonstrate that these

stories appeal to a morbid and shameful interest in sex.

Next the government will have to show that an average
person applying contemporary community standards
would find that the materials depict sexual conduct in a
patently offensive manner. You will hear testimony,
for example…that his stories…describe acts between
adult males, usually family members, and female children
as young as four years old; and that they include
descriptions of oral sex, vaginal sex, ejaculation for the
purpose of impregnation, brutal rape resulting in murder;
all acts prohibited under both state and federal law.

Finally, the government has to show that a reasonable
person viewing these materials as a whole would find
that they lack serious literary, artistic, political, and
scientific value. In this regard, the government wants
to make clear that the value under this prong, the value
that needs to be assigned under this prong has to be
serious so that the presence of some literary value or
a slight artistic value or even the use of some literary
device does not necessarily make these stories at
issues serious under this prong, and the evidence will
show that the stories themselves indeed do not have
the serious value necessary.

Tr. 1 at 16-17. McCoy deferred his opening statement to the conclusion of the

government's case. Tr. 1 at 17.

The government's first witness was Brant. Tr. 1 at 22. He testified to the

progress of the investigation of McCoy, and the government admitted all of

McCoy's writings into evidence through him. Tr. 1 at 24- 66; G. Ex. 1; G. Ex. 2;

G. Ex. 3; G. Exs. 5A-S; G. Ex. 8; G. Ex. 9; G. Ex. 10; G. Ex. 11.

9

The government's second witness was Charles Ankney, of the St. Paul, Minnesota police department. Tr. 1 at 66-67. Ankney testified generally about responding to a call that McCoy's wife made to the police department, expressing concern about his pornography collection. Tr. 1 at 67-73.

The government third called Jared Drengson, an ICE agent based in Minneapolis, Minnesota. Tr. 1 at 73-74. Drengson testified generally to the circumstances of McCoy's arrest on the federal warrant. Tr. 1 at 74-85. Notably, he said that, while transporting McCoy to the federal courthouse in Minneapolis, McCoy remarked that, "…he put his stories on the Internet to create a stir." Tr. 1 at 83-84.

The government's fourth and final witness was James Fottrell, a member of the high-tech investigative unit within the Department of Justice's child exploitation and obscenity section. Tr. 1 at 85. Fottrell testified generally to his forensic analysis of McCoy's computer. Tr. 1 at 85-133. He noted that McCoy's stories were available both through individual "links" and as a single, compressed "zip" file. Tr. 1 at 93; G. Exs. 17B –F. Through Fottrell, the government introduced "print screens" – hard copy recreations – of McCoy's websites, to show what the internet viewer would have encountered there. Tr. 1 at 100; G. Ex. 18-E.

Subsequent to Fottrell's testimony, the government rested, noting that it filed affidavits from custodians of records at the internet providers that hosted McCoy's

10

website, as well as the joint stipulations by McCoy and the government. Tr. 1 at 133-35; Docs. 135, 136, 145, and 146.

McCoy then made an oral motion for judgment of acquittal, to which the government responded. Tr. 1 at 141-66. Notably, during the back and forth the district court repeatedly expressed concern about how it should judge whether McCoy's stories were legally obscene:

> That's kind of what I am hearing them argue, that there's nothing in the evidence for the Court to rely upon that its understanding of what literary value is as it relates to I guess the field as opposed to just the Court's personal taste in literature or whatever.
>
> …
>
> But how does the Court make a determination of what is the – of whether something has any value for literary, scientific, or other purposes other than its own opinion if there's nothing else in the record where someone says I have got knowledge, I have reviewed these things, here are the indicators of valuable art…Not that the Court has to accept it, but it gives the Court some basis from which to make an observation.
> …
> …In other words, how does it get out of just being an opinion of an individual judge?

Tr. 1 at 149-52. In the end, the district court decided to defer ruling on the motion for acquittal. Tr. 1 at 164.

McCoy then delivered his opening statement, emphasizing the literary, artistic, and political value of his writings as a whole:

The defense expects the evidence to show that the body of work submitted by the government as an exhibit in this case, some 240 stories, which are basically the memorialization of his fictional musings, that these things taken as a whole, in fact, do not lack serious literary, artistic, or political value.

We expect the evidence to show that these works, in fact, manifest creative uses of language as well as a number of variations on the use of language. We expect the evidence to show that they manifest creative use in a variety of narrative devices, that they manifest instances of intertextuality where the author reworks and re-examines told by other authors, some of them quite old.

We also expect the evidence to show that his work manipulates point of view where it's advantageous to the author's creative purpose, and certainly that the longer works, which notably were not selected as part of the 18 that the government would like to reduce the case to, but the longer works approach the length of a novel, and that those maintain a consistency of character, which is that characteristics of a fictional character remain the same throughout the length of a story, something that is quite difficult to do.

Additionally, we expect the evidence to show that these works manifest numerous instances of parody and spoof, other literary elements; and that they explore difficult themes in general, which is an element of literary value. Some of these themes would be explored through parody.

Tr. 1 at 165-66.

McCoy then called his witness, Gary Richardson. Tr. 1 at 167. Richardson described his credentials:

12

> I have an undergraduate degree in English and history from
> what is now the University of Louisiana at Monroe. I have
> an M.A. from the same institution…I have a Ph.D. from
> the University of Illinois at Urbana-Champaign…
>
> I've been, postdoctoral, Mellon Fellow at Vanderbilt
> University. I've been a postdoctoral NEH Fellow at
> Notre Dame…
>
> I'm a professor of English at Mercer University in Macon,
> Georgia…
>
> I'm chair of the English Department and serve on
> several committees…I did teach for a term at what is
> now Redboud…University in Nijmegen in the
> Netherlands as a Fulbright professor.
>
> I am a member of Phi Kappa Phi, which is an honor
> fraternity. I a member of Sigma Tau Delta. I have obtained
> numerous award from Mercer to facilitate scholarship
> in research.
>
> …So I am a member of the National Modern Language
> Association, the South Atlantic Modern Language
> Association, the International American and
> Southeastern Society for 18th Century Studies. I'm a
> Member of the David Mamet Society, the Shaw Society…

Tr. 1 at 167-70. The defense then tendered Richardson "as an expert in literary

analysis." Tr. 1 at 171. The government did not object. Tr. 1 at 171.

Richardson defined "literary writing" as "…imaginative writing, which can

be either narrative or lyric, which is meant to be shared between an author and an

audience." Tr. 1 at 171. He went on to say:

> Narrative fiction usually has certain characteristics. It has a
> point of view usually expressed through a narrator. It uses

> language in particular ways that are appropriate to the
> characters under discussion in the best literature. It uses
> language in particular ways to – in explicit, precise ways that
> are appropriate to the subject matter. It occasionally will make
> use of what we would think of as intertextuality, a relationship
> or a presumption on the part of the writer that members of
> his or her audience would have expectations of particular
> works or of a genre of literature…

Tr. 1 at 172-73.

Asked how he would gauge the value of a literary work, Richardson

testified:

> Now, there are numerous ways in which value might be
> ascribed to a piece of literature. For example, a great deal
> of formal experimentation might constitute value in a work.
> A work whose language itself, say someone like Shakespeare
> whose language is so wonderfully rich, that that would
> constitute literary value; the ability to draw human experience
> in a particular way that would be enlightening, insightful
> to the audience; and of course, work that, on its face may well
> have a political – if not on its face, at least in its substance
> may have a political purpose.

Tr. 1 at 173-74.

Richardson then testified, generally, about some ways in which the value of

written work might be evaluated. Tr. 1 at 175-76. On the objectivity of literary

value, he said:

> It is more an instance of being able to discover what
> doesn't necessarily appeal to one as opposed to what has
> value. We all have our prejudices, our biases, about
> what kinds of literatures we like and which kinds we

14

don't enjoy. That, however, does not necessarily mean
that it lacks value…

So those of us who spend our times discussing these
issues and thinking about them have come to a
conclusion that if the work in front of you manifests
these characteristics and has a certain degree of
competence, then it probably has a degree of value.
Then it becomes a question of how well does the person,
the writer, accomplish what he or she wishes to
accomplish.

Tr. 1 at 176-77.

Turning to McCoy's writings specifically, Richardson testified:

…what I attempted to do was to look at the way in which
Mr. McCoy's works deployed language. So, for example,
I would look at the language he attached to particular
characters, did that language seem consistent to the
character. If it was supposed to be a young person or if it
was supposed to be someone with little education or
from a rural background, did the language reflect that?

If, on the other hand, I was looking at whether or not
he was capable or actually did use previous kinds of
literature in self-conscious parodic or spoofing ways
to, in some senses, suggest to certain readers who,
themselves, were familiar with that kind of literature,
you know, that there was another level of enjoyment
here. And this goes back to in some instances the
intertextuality.

…

In other instances, he made use of conventions
associated with science fiction or with fantasy/Sci-Fi
as a way of presenting what he – the material he was
talking about in ways that would have been new and
interesting for his readers.

15

> One of the most interesting, quite frankly to me, was a
> series of stories that he noted as incomplete, but in
> his preface or – I can't remember if it was a preface
> or a prologue – I mean a prologue or an epilogue –
> noted that in attempting to do this, he had challenged
> himself to structure the stories so that they would run
> like a serial.

Tr. 1 at 177-79.

After testifying that McCoy's stories possessed serious literary and political

value, Richardson explained his opinion:

> Formally, Mr. McCoy's work is not cutting edge. Except
> for the age of many of the young people in these stories,
> these are basic romance plots…
> On the other hand, to may way of thinking, these stories
> raise significant issues, that we need to take note of. The
> first of these I think is the idea that, you know, exactly
> how do we define sexuality in our culture and what are
> its acceptable parameters.
>
> He is in some senses by sort of going after the last bastion
> of what is generally repulsive sexual action. I mean, most
> people would have exactly the same response that apparently
> everybody in the courtroom has had to this. So we either
> have to predicate that Mr. McCoy has no sense of his
> audience or has deliberately undertaken these with a purpose.
>
> And I think one of the things he wants us to think about
> is sexuality, and to distinguish sexuality from the second
> theme, and that is love and the interaction between the two.
> What constitutes actual love as opposed to how we sling
> the word around and people use it to cover a multitude of
> sins.
>
> In addition, I think he wishes us to recognize that our

cultural mores in some senses define us now, they do not
necessarily define us 200 years ago, and they certainly may
not define us a hundred years from now. But if in the
marketplace of ideas, we cannot write things down and not
put them in a drawer in our house, but take them out into
the marketplace of ideas and share them with other people,
then where is the conversation to come from? How is our
culture to contemplate change, not change necessarily
but even to contemplate it?

Tr. 1 at 180-82.

Richardson continued:

Well, if one reads the totality, the 240 stories, the prologues,
the epilogues that go along with them, one sees again and
again Mr. McCoy attempting to undertake an artistic
rendering.

But he also seems to be very much intent upon defending
what he perceives of as his individual liberty…

Tr. 1 at 184-89.

And more:

Well, the totality of the work, the entire 240 stories,
suggested to me that the variety of approaches, despite
the general focus on one or two standard plots,
suggests an attempt to bring to bear literary devices,
mechanisms, forms in such a way as to make a serious
effort at speaking to the topics in a way that reflects
serious thought and serious artistry.

I guess I would have to note that for something to be
constituted as literature, it does not necessarily have to
be on equivalent with Shakespeare or Dickens or
anyone else. If that were the case, Barnes and Noble
would have to essentially sweep its shelves and take
most of what we think of as contemporary literature

off its shelves.

So does it have serious intent? Yes, it does. Is the matter that it concerns or addresses serious? Yes, it is. And therefore, it has serious value from the perspective of those of us who study literature.

Tr. 2 at 4-5.

Richardson was then asked about the 18 stories chosen by the government as "representative" tales for purposes of rendering a verdict(s) on the legal obscenity of McCoy's work as a whole:

Defense: Are you familiar with these 18, Professor?

Richardson: Yes.

Defense: If you were to discuss the relative literary value of these 18 in comparison with the literary value of the larger body of work that you reviewed, the 240 stories, how would you say that would compare?

Richardson: The large number of very short pieces in that particular list makes it difficult for people to evaluate the literary quality of the material.

Narrative operates primarily through character development, in our increasing awareness of the complexity of motivation and psychology within characters. So every time you choose a very short piece as a selection, it becomes increasingly difficult to see that.

…

So if you look at the short quality of the short length of some of these stories, it would be difficult to see that. The longer ones tend to validate, more obviously, my

18

> observation about the literary the specifically literary
> as opposed to political seriousness of the works.
>
> The shorter pieces I would tend to move toward the
> political end of the spectrum that I talked about
> yesterday, which has a value in and of itself, but it is
> not necessarily an aesthetic value. But it does not
> detract because it is within the political realm from the
> seriousness of the literary value.

Tr. 2 at 9-10.

Continuing to address the political aspect of McCoy's work, Richardson

testified:

> …I would make the observation that there's a political
> theme here that our culture has become increasingly
> more repressive in terms of sexual mores over that last
> at least 40 years, and Mr. McCoy's stories seem to
> insist that that conversation needs to be reopened with
> some degree of seriousness, and these stories seem to
> be a way to insist upon that.

Tr. 2 at 18.

Richardson summed up: "Under the narrow definition of literary value, it

does have serious literary value." Tr. 2 at 19.

After the government concluded its cross-examination of Richardson, the

district court engaged him:

> Court: Professor, you have referred to the defendant's work,
> now the Court has been told about 240-something stories,
> 18 that have been put into evidence here, and what I think of,
> of course, you think of a work by Shakespeare, you know,

19

Julius Caesar being a work, and then you think of Shakespeare's entire work. Explain to me how do you – how is it that you view these as not individual works and – In other words, are there two ways to look at it, are they to be looked at as individual works and to be looked at as an entire work? And if so, why is that and what is the significance of it?

Richardson: Well, Your Honor, if we were to make assessments of any writer's work based upon a single instance of that writer's works, we might well come to different conclusions about the relative quality of that writer's efforts.

For instance, I teach Shakespeare. I almost never teach the three Henry the Sixth plays because Shakespeare wrote better plays. And if I were to assess Shakespeare's work solely on the basis of one of those plays, I might consider him a quite mediocre playwright. He got better as a writer. And therefore, if I'm going to evaluate the totality – of if I'm going to estimate Shakespeare's work, I need to read the whole thing and I have, and in some senses, I read everything that was here. I was asked to make an evaluation about the serious nature of all of these, and that's what I have attempted to present to the Court.

Tr. 2 at 60-61.

On recross examination, Richardson agreed that he might sometimes teach carefully selected works of a particular author as representative of their entire oeuvre. Tr. 2 at 61-62. He did not believe, however, that the 18 stories picked by the government were such a careful, representative selection of McCoy's work. Tr. 2 at 62.

McCoy rested his case after Richardson's testimony. Tr. 2 at 63.

20

The government submitted its written closing argument on January 27, 2010. Doc. 159. It began by asserting that McCoy violated federal law by "…sending an undercover agent links to three Internet websites that carried text stories that describe in graphic and explicit detail the sexual abuse, rape, torture, and murder of children." Doc. 159 at 1. The government then reiterated its argument that each of McCoy's stories amounted to a "work as a whole" for purposes of determining its legal obscenity. Doc. 159 at 7 n.3. The government went on to repeat its characterization of the subject matter of McCoy's work. Doc. 159 at 9-10 and 12.

Only then did the government engage with the question of whether McCoy's stories had serious artistic, literary, or political value. Doc. 159 at 13. The government contended that McCoy did not intend for his work to have serious artistic, literary, or political value, and argued that Richardson's testimony was incredible. Doc. 159 at 14-19.

In response, McCoy's closing argument noted that the government, beyond having submitted McCoy's stories themselves, had failed to offer any affirmative evidence that his work was legally obscene. Doc. 161. At length, it spelled out the manner in which the defense, through Richardson's testimony, had affirmatively shown the serious artistic, literary, and political value of McCoy's work. Doc. 161 at 3-14. The government's rebuttal, included a basic account of federal obscenity law, and a renewed attack on Richardson's learned opinion. Doc. 163.

21

On February 3, 2010, McCoy filed a "Motion to Preclude the Government from Constructively Amending the Indictment." Doc. 160.  In the motion, McCoy objected to the government's proposal that the district court render its verdict based on 18 stories selected by the government or, alternatively, any one of the 240 stories submitted into evidence at trial. Either approach, said McCoy, would broaden the bases for conviction alleged in the single count indictment, which treated all 240 of McCoy's stories as the relevant "work as a whole," or unit of prosecution. Doc. 160.

The government replied that its proposals did not work a constructive amendment of the indictment; the number of obscene matters transported in interstate commerce, it argued, was not an element of the charged offense, and so the district court was entitled to render a verdict on the 18 stories or any single one of them. Doc. 162. In response, McCoy contested the government's characterization of the elements of an obscenity prosecution, noting that the district court was required to judge McCoy's work "as a whole," a requirement directly implicated by the government's attempts to lure the court to focus on limited bits and pieces of his written corpus. Doc. 164.

The district court rendered a guilty verdict in a bench opinion dated March 29, 2013. Doc. 171. It summarily denied McCoy's "Motion to Preclude the Government from Constructively Amending the Indictment." Doc. 171 at 3. The

22

district court then found that McCoy's stories met all of the criteria for legal obscenity, concluding en route that the 18 stories proffered for judgment by the government constituted a representative sampling of McCoy's work from which it was authorized to pass judgment on the "work as a whole." Doc. 171 at 6-13.

Judgment was entered on August 12, 2013. Doc. 189. McCoy filed a timely notice of appeal on August 22, 2013. Doc. 192.

## STANDARDS AND SCOPES OF REVIEW

The applicable standards and scopes of review are set forth in the argument, *infra*. *See* Fed. R. App. P. 28(a)(9)(b).

## SUMMARY OF ARGUMENT

**I.    The district court's charge was to evaluate McCoy's work as a whole to judge its obscenity. Yet, although it ultimately concluded that McCoy's stories, as a whole, are obscene, it reached that conclusion by using 18 of them, chosen by the government, as proxies for the rest.**

Further, the 18 stories judged by the district court were not, in fact, representative of McCoy's work as a whole. Rather, they were shorter and less developed than much of his work, and therefore unsuitable examples of the remainder, which were clearer instances of the artistic, literary, and political quality of McCoy's work.

Finally, the evidence showed that it was neither the 18 stories nor the totality of McCoy's stories that should have been judged the "work as a whole." Instead, the work as a whole was McCoy's webpage, which was arranged like a volume of collected works or a magazine and contained the stories, commentary on them, and author information.

The district court did not judge McCoy's work as a whole and, consequently, his conviction must be vacated and his case remanded for a new trial before a different district court judge.

**II.    The district court found that the record was devoid of any intent by McCoy to create a work of artistic, literary and political value. That finding was erroneous. Expert testimony on McCoy's behalf, as well as his writings themselves and his statements to police, all showed his serious artistic, literary, and political purpose.**

24

Further, McCoy's purpose should not have been the most important factor relied on by the district court in assessing the obscenity of his work. Although the Supreme Court has held that evidence of an author's purpose may be relevant to deciding a close obscenity case, it has never said such evidence may be given primary or decisive weight.

Lastly, the district court mistakenly focused on the subject matter of McCoy's work, holding that the "murk" of his chosen topics effectively precluded his work from being regarded as having serious artistic, literary, or political value.

Because the district court misapplied the *Miller* test for obscenity, McCoy's conviction must be vacated and his case remanded for a new trial before a different district court judge.

**III.    The single count indictment charged McCoy with aiding the downloading into the Middle District of Georgia all of his "obscene fantasy stories" in bulk. McCoy had a right to be tried on that allegation by the grand jury. But, by judging only 18 of McCoy's stories, the district court amended the terms of the charge, and McCoy was tried for an offense distinct from the one in the indictment.**

The district court constructively amended the indictment, and McCoy's conviction should be vacated and his case remanded for a new trial before a different district court judge.

**IV.    The entirety of the government's evidence of obscenity in this case consists of McCoy's stories themselves. McCoy presented detailed testimony from a distinguished academic that his work does possess**

25

**serious artistic, literary, and political value. By declining to present any affirmative evidence to counter the evidence of artistic and political value introduced by McCoy, the government failed to carry its burden of proving his work – which, as a whole, is not in fact obscene – violated the statute.**

Because McCoy's work, taken as a whole, possesses serious artistic, literary, and political value, his conviction must be vacated and his case remanded for entry of a judgment of acquittal.

## ARGUMENT

## I. THE DISTRICT COURT FAILED TO JUDGE FRANK MCCOY'S WORK AS A WHOLE.

### A. Standard of Review

This Court conducts an independent review and evaluation of material judged obscene in light of the *Miller* criteria. *United States v. Bagnell*, 679 F.2d 826, 835 (11th Cir. 1982).

### B. Frank McCoy's Webpage was his "Work as a Whole."

The indictment in this case accused McCoy of aiding and abetting the transportation of obscenity into the Middle District of Georgia by using the internet to transmit three "links" to "web sites" containing allegedly obscene "stories" into the Middle District, thereby facilitating Brant's downloading of the allegedly obscene "stories" from the "web sites" into the Middle District. Doc. 1. The "web sites" were all mirror images of one another, and contained the same "stories." Tr. 1 at 28 and 44-45; G. Exs. 3, 9, and 11. The date span of the indictment – June 23, 2002 to August 6, 2006, includes the occasions on which Brant downloaded McCoy's stories *en masse*. Doc. 1; Tr. 1 at 28, 44, and 47; G. Exs. 3, 9, and 11. In fact, Brant downloaded the totality of the web sites – the stories, the prologues and epilogues to the stories, McCoy's commentary on his writings and their purpose,

27

and McCoy's "about the author" blurb into the Middle District. G. Exs. 3, 9, and 11.

In its trial brief, the government requested that the district court, rather than judging the obscenity of the websites or even the stories *in toto*, asked the district court to render 18 special verdicts as to each of 18 stories, handpicked by the government, that it claimed were "representative" of McCoy's work as a whole. Doc. 141 at 3. McCoy objected, contending that his "work as a whole," for purposes of the *Miller* test, consisted of every last one of the stories Brant downloaded into the Middle District. Doc. 143 at 3-4. The government replied that its approach was permissible because McCoy "held out" his stories as individual works on his webpage. Doc. 144 at 5-8. The district court deferred a decision on the dispute until the conclusion of trial. Tr. 1 at 11-12.

In its closing argument, the government amended its position; it told the district court that it could judge any one of McCoy's stories. Doc. 159 at 7 n. 3. McCoy again objected, pressing the contention that the government's cherry-picked stories were not representative of his work as a whole, which he maintained was the entirety of his tales, and arguing that the government's approach would amend the indictment or effect a variance. Doc. 160. The government denied that it sought to amend the indictment or work a fatal variance. Doc. 162. McCoy replied,

reiterating his position, and making the case that his webpage was arrayed in such a way that it constituted a unified "work." Doc. 164.

The district court, relying on a single, unpublished district court decision from another jurisdiction, determined that the 18 government-chosen stories "represent(ed) Defendant's entire body of work." Doc. 171 at 6. Notably, the district court did not claim to have read the entire contents of McCoy's webpage, or even all of his stories, to arrive at this conclusion, even though both were entered by the government as exhibits at trial. Doc. 171 at 6; G. Exs. 3, 9, and 11. Rather, the district court relied on "the testimony at trial and the Defendant's own characterizations of his stories" in deciding to treat the 18 stories as proxies for the whole of McCoy's writings. Doc. 171 at 6.

*Miller* and its progeny require the factfinder to apply a three part test to determine if material is legally obscene:

> The basic guidelines for the trier of fact must be:
> (a) whether the average person, applying contemporary
> community standards, would find that the work, taken
> as a whole, appeals to the prurient interest; (b) whether
> the work depicts or describes, in a patently offensive
> way, sexual conduct specifically defined by the
> applicable state law; and (c) whether the work, taken
> as a whole, lacks serious literary, artistic, political, or
> scientific value.

413 U.S. 15, 24 (1973); *Bagnell*, 679 F.2d at 835 (same).

An accurate determination of what constitutes the "work as a whole" is critical to the correct application of the *Miller* test because it prevents the condemnation of an entire work based on an offensive isolated excerpt. *Ginzburg v. United States*, 383 U.S. 463, 466 n. 5 (1966) (holding two magazines obscene "as a whole" without reference to particular articles therein); *Penthouse International, Ltd. v. McAuliffe*, 610 F.2d 1353, 1367-74 (5th Cir. 1980) (discussing evolution of "as a whole" requirement and applying it to magazines).[4] Here, the district court made three errors in applying the "work as a whole" requirement of *Miller*.

First, according to the district court it found that 18 stories "focused on" by the government were representative of McCoy's work as a whole, not by independently reviewing that work itself (although it was in evidence), but "based on the testimony provided at trial and the Defendant's own characterizations of his stories…". Tr. 1 at 6; G. Exs. 3, 9, and 11. This was serious error; without having considered the entirety of what appeared on McCoy's webpage, there was no principled way for the district court to reliably determine whether the 18 stories picked by the government were, in fact, representative of the work as a whole. *Miller*, 413 U.S. at 28-29 (rejecting "institutional stress" as an inadequate reason to

---

[4] Decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

abandon the attempt to define obscenity or independent judicial review of allegedly obscene materials); *United States v. Thevis*, 484 F.2d 1149, 1156-57 (5th Cir. 1973) (applying the "as a whole" requirement to magazines).

Further, although the district court based its finding in part on "the testimony at trial," the only testimony directly on point was Richardson's, and he testified that the 18 stories chosen by the government were *unrepresentative* of McCoy's work generally. Tr. 2 at 62.

Finally, counsel has been unable to find any precedent permitting the finder of fact to judge the obscenity of a "work as a whole" by evaluating samples of that work and relying on the descriptions of others to determine that the samples are "representative." To the contrary, both district and appellate courts independently review materials alleged to be obscene in their entirety. *E.g.*, *Penthouse International, Ltd. v. McAuliffe*, 454 F.Supp. 289 (N.D. Georgia 1978); *Penthouse International, Ltd.*, 610 F.2d 1353; *Skyywalker Records, Inc. v. Navarro*, 739 F.Supp. 578 (S.D. Florida 1990).

Second, the 18 stories were not, in fact, representative of McCoy's work as a whole. Whether one considers McCoy's webpage his work as a whole (as McCoy maintains should be the case) or considers the entirety of his stories the work as a whole, the government's selection is *unrepresentative*. Tr. 2 at 62. The 18 stories are some of the shortest stories; as Richardson noted, this makes it more difficult to

31

see the literary and artistic value in them, as opposed to McCoy's longer works,

and also exaggerates the prominence of the sexual material. Tr. 2 at 9-10; *Compare*

G. Ex. 3, 9, and 11 ("Her Father's Daughter"; "The Guarantee"; "Helping Big

Brother"; "Daddy's Lessons"; "Interruptions"). And, unlike many of the other

pieces on McCoy's webpage, the cherry-picked stories lack explanatory prologues

or epilogues that might have explained their genesis or the author's purpose in

crafting them; for example, the forward to "Her Father's Daughter," a nearly

novel-length work:

> Foreword
>
> NOTICE: This book contains highly erotic, and explicit
> sexual material.  If you are even slightly offended by such
> material, I suggest that you stop reading right now!  The book
> contains graphic descriptions of all sorts of sex.  It is
> completely non-violent though.
>
>  I wrote this book, because of the implicit and implied
> censorship, that I feel permeates the literature of today.
> What's that you say, You've seen books on every subject down
>  at the local bookstore cum porn-shop?  Check them out again.
> Lately, all the books on incest, bondage, bestiality, and
> children having sex, have vanished.  Well, not ALL.  In some
> cities, in some parts of the country, you can still find some
> books on incest.  Not many, and they are getting unrealistic, as
> the most likely time for incest to occur, is when a person is a
> child, not when the person is over 18, and in college.
>
> For a period of about 7 years, starting about 1975, there
> was a sexual revolution, in this country, and almost anything
> could be printed.  At that time, I bought and read almost
> everything I could get my hands on.  90% of it was junk, but OH!,
> that 10% remaining!  Then, over the years, the censors started

> cracking down again.  The bookstores knuckled under to the pressure, the RICO act was used to threaten those who didn't comply, and even the publishers had to give in.  It now seems to be a crime worse than murder to publish a story about little children having sex, people having sex with dogs, brothers having sex with their sisters, (or heaven forbid, their parents) or even light bondage seems to be verboten.  (Personally, tying up someone, or being tied up, is a turn-off, not a turn-on.  But, to each his own.)

G. Exs. 3, 9, and 11; *Thevis*, 484 F.2d at 1156-57 (six magazines protected by the

First Amendment because of  "significant content of literary matter, including

short stories of at least arguable merit as well as discussions of lesbianism,

homosexuality, nudity, censorship, photography, marital sexual problems, and the

nude in fine art").

Third, neither the 18 stories actually judged by the district court, nor the 276

stories downloaded by Brant, constitute the relevant "work as a whole," which was

really McCoy's webpage. Doc. 171 at 6; G. Exs. 3, 9, and 11. McCoy's webpage

was arranged like a book of an author's "collected works" or a magazine. Tr. 1 at

100; G. Ex. 18-E; G. Exs. 3, 9, and 11. It began with an "about the author"

introduction that described McCoy and his work generally. Tr. 1 at 27-28 and 100;

G. Ex. 18-E. Then, the stories followed, accessible by individual "links," like

chapters.  Tr. 1 at 93; G. Exs. 17B-F; G. Ex. 18-E; G. Exs. 3, 9, and 11. Several of

the individual stories were preceded or followed by explanatory prologues or

epilogues. *E.g.*, G. Exs. 3, 9, and 11 ("Her Father's Daughter"; "Helping Big

33

Brother"; "Daddy's Lessons"). The stories share common themes and techniques, and are not just tethered by an allegedly prurient interest. *E.g.*, Tr. 1 at 180-89; Tr. 2 at 4-5 and 18-19.

In short, McCoy's webpage was arranged just like any number of essay and story collections on counsel's bookshelf at this very moment. *E.g.*, Harold Brodkey, "Stories in an Almost Classical Mode," Vintage Books 1989 (containing "Innocence," a story that, over thirty or so pages, describes, in close detail, cunnilingus and orgasm, as well as two other stories notorious for their "offensive" sexual content – "Puberty" and "S.L." – but still hailed, as a whole, as a major literary accomplishment); Gore Vidal, "United States," Random House 1993, ("I wrote the first of these pieces in 1952, the year that Eisenhower was elected president, and the last in 1992, the year of Clinton's election…This collection represents about two thirds of the essays or pieces that I have published over forty years. They seem to fall naturally into three categories: literature, or the state of the art; politics, or the state of the union; personal responses to people and events…So, herewith, my three states – united); "The 120 Days of Sodom and Other Writings," Marquis de Sade, Grove Press 1966, etc. McCoy's webpage also closely resembled a thematically organized magazine. G. Exs. 3, 9, and 11; *Compare, e.g.*, "Granta," http://www.granta.com/Archive/Issues.

But no one would contend, for example, that "Stories in an Almost Classical Mode" is legally obscene because it contains "Innocence," yet that is precisely what the district court did here when it relied on a single, unpublished district court decision to characterize the government's 18 handpicked stories as representative of McCoy's entire ouevre. *Penthouse International, Ltd.*, 610 F.2d at 1371 (viewing issues of "Playboy," "Penthouse," and "Oui" magazines as whole works; finding "Playboy" has serious artistic, literary, and political value, while "Penthouse" and "Oui" do not); *Thevis*, 484 F.2d at 1156-57; *United States v. Thevis*, 526 F.2d 989, 992 (5th Cir. 1976) ("Lezo" magazine protected because "it contains a serious discussion of female homosexuality").

The district court's reliance on *United States v. Extreme Associates,* 2009 WL 113767 (W.D. Pennsylvania 2009), to find the 18 representative of the whole of McCoy's work is entirely unpersuasive. Doc. 171 at 6. *Extreme Associates* concerned a website comprised of discrete pornographic video clips. 2009 WL 113767 at *2. The clips were presented without any context, were apparently plucked from the work of multiple filmmakers, and were totally unrelated to one another, except by the grouping of clips featuring like sexual fetishes in the same area of the website.  2009 WL 113767 at *2 (citing a passage of *Kois v. Wisconsin*, 408 U.S. 229, 231-32 (1972), that condemns a "book" comprised of nothing more than "salacious extracts" from other works, and which itself did not amount to

"any book as a whole"). The clips do not appear to have had any narrative content at all, much less any claim or aspiration to provide serious artistic, literary, or political value. *Id*.

McCoy's webpage, for the reasons stated, *supra*, and in Richardson's testimony, is obviously dissimilar to the mere scrapbook of short pornographic video clips in *Extreme Associates*, and the district court's reliance on that case to find that the 18 stories chosen by the government represented the whole of his work was misplaced.

### Conclusion

Because the district court did not review all of the McCoy's work in deciding the question of what constituted his "work as a whole," erroneously decided that the 18 stories handpicked by the government were representative of his work as a whole, and failed to consider McCoy's webpage as his "work as a whole," McCoy's conviction should be vacated, and his case remanded for a new trial before a different judge.[5]

## II.    THE DISTRICT COURT MISAPPLIED THE *MILLER* TEST.

---

[5] By asking that the case be remanded to a different judge, McCoy does not in any way intend to imply that the original district judge in this case behaved in improperly, or with bias, etc. Given the natural human difficulty in shaking loose fixed opinions, however, McCoy suggests that it might be an appropriate exercise of this Court's discretion to remand to a judge who was not sat, at length, through the evidence, and rendered a guilty verdict based on it. *United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir. 1989).

### A. Standard of Review

This Court conducts an independent review and evaluation of material judged obscene in light of the *Miller* criteria. *United States v. Bagnell*, 679 F.2d 826, 835 (11th Cir. 1982).

### B. The District Court Mistakenly Privileged Frank McCoy's Purpose as the "Most Important" Indicator of the Legal Obscenity of his Work.

The district court, notwithstanding Richardson's testimony to the contrary, opined that it could not discern artistic, literary, or political value in McCoy's work. Doc. 171 at 12. In reaching that conclusion, the district court said, "*Most importantly*, notwithstanding Professor Richardson's analysis and opinion, *no* evidence exists in the Record to support a finding that the Defendant's *purpose* was artistic, scientific or political. The Record instead establishes a clear purpose to appeal to prurient interest, especially with prepubescent female children." Doc. 171 at 12. (emphasis added). The district court erred in three ways.

First, the district court's finding is incorrect; there are many indications in the record that McCoy's purpose in writing was to advance an artistic, literary, and political agenda. Upon his arrest, McCoy told Ankney that he published his work on the internet "to create a stir." Tr. 1 at 84. Richardson explained the manifestations of that agenda in McCoy's work at length. Tr. 1 at 177-89; Tr. 2 at 4-19. Additionally, the government's exhibits contain statements, explicit and

37

implicit, by McCoy of his artistic and political agenda. G. Exs. 3, 9, and 11 ("Her Father's Daughter"; "Helping Big Brother"; "Daddy's Lessons").

Second, by privileging McCoy's *purpose* in his work as the "most important(ly)" indicator of the obscenity of the work itself, the district court departed from the correct application of the *Miller* test for obscenity. Doc. 171 at 12. Although the Supreme Court has opined that circumstantial evidence of a defendant's intent may be *relevant*, in a close case, to determining whether a work is obscene, it has never held that such evidence may be dispositive, or that it may take precedence over an evaluation of the content of the work itself:

> It is important to stress that this analysis simply elaborates the test by which the obscenity vel non of the material must be judged. Where an exploitation of interests in titillation by pornography is shown with respect to material lending itself to such exploitation through pervasive treatment or description of sexual matters, such evidence *may support* the determination that the material is obscene even though in other contexts the material would escape such condemnation.

*Ginzburg*, 383 U.S. at 475-76 (emphasis added).   Yet, according to its own ruling, that is exactly what the district court did in McCoy's case. Doc. 171 at 12.

Third, the district court held that, "[e]ven if the Court found that the Defendant sought to incite political discourse *and* provide artistic commentary on society as Professor Richardson suggests, the Court can find no literary value within the murk of rape, incest, abuse, molestation, and vivid descriptions of the

38

violations of children as composed within Defendant's work." Doc. 171 at 12. This holding not only effectively makes *Miller* a conjunctive, rather than disjunctive, test – the district court hypothesizes that McCoy's work could have political *and* artistic worth but *still* lack literary value sufficient to take it out of the obscene – it makes literary (and, presumably, artistic and political) value hinge on subject matter.

Taken at its word, the district court held that McCoy's work *must* be obscene because of the "murk" of its subject matter; but, that is not the law and it would render obscene any number of works that are indisputably protected by the First Amendment. *E.g.*, http://www.masteringfilm.com/the-controversy-of-children-in-film/; http://bannedbooks.world.edu/2012/07/15/banned-books-awareness-bastard-out-of-carolina/; http://bannedbooks.world.edu/2011/03/20/banned-book-awareness-color-purple-alice-walker/; http://gawker.com/the-bizarre-parent-letter-that-got-invisible-man-banned-1351663124; *See also*, *Jenkins v. Georgia*, 418 U.S. 153, 159-62 (1974) (holding that the film "Carnal Knowledge" was not the kind of "hard core" pornography subject to regulation under *Miller*).

## Conclusion

Because the district court did not acknowledge or account for unequivocal statements of McCoy's artistic and political purpose, misapplied *Miller* by making McCoy's intent the primary determinant of the obscenity of his work, rather than

the content of the work itself, and mistakenly concluded that the subject matter of McCoy's work necessarily deprived it of serious artistic, literary, or political value, McCoy's conviction must be vacated and his case remanded for a new trial before a different judge.

### III.   THE DISTRICT COURT CONSTRUCTIVELY AMENDED THE INDICTMENT.

#### A. Standard of Review

This Court determines whether the government's conduct or the district court's instructions, considered in context, literally or effectively expanded the indictment. *United States v. Behety*, 32 F.3d 503, 508-09 (11th Cir. 1994) (citing *United States v. Andrews*, 850 F.2d 1557, 1559 (11th Cir. 1988) (*en banc*); *United States v. Salinas*, 654 F.2d 319, 324 (5th Cir. Unit A 1981)).

#### B. The Indictment Charged That McCoy's Stories, as a Whole, Were Obscene.

The facts relevant to this argument are essentially the same as those set forth in Argument I, *supra*. Additionally:

Subsequent to trial, McCoy filed a "Motion to Preclude the Government from Constructively Amending the Indictment." Doc. 160. The motion argued that the government, by seeking special verdicts on 18 of McCoy's stories or as to any single story, was trying to amend the indictment, which on its single count face charged that McCoy's stories as a whole were obscene. Doc. 160 at 2-4. McCoy

pointed out that the facts of the case tracked the indictment; Brant downloaded the contents of McCoy's webpage *in toto*. Doc. 160 at 4. Thus, said McCoy, by asking for special verdicts on each of 18 stories, or as to any one of the stories, the government was seeking to expand the bases on which McCoy might be convicted beyond the *en masse* "stories" specified in the indictment. Doc. 160 at 7-9.

The government replied that since quantity (of stories) was not an essential element of an 18 U.S.C. § 1462 violation, no amendment would be effected were the district court to indulge one of its special verdict requests. Doc. 162 at 1-4. Rather, the government said, it was merely informing the district court of the several ways in which it might find McCoy guilty, all of which were implicit in the indictment. Doc. 162 at 3-4. McCoy responded that, by virtue of *Miller*'s "taken as a whole" requirement, quantity was, in fact, an essential element of the single count indictment as charged. Doc. 164 at 1-2.

The district court denied McCoy's motion, holding that the special verdict request did not deviate from the factual allegations in the charge, and that quantity was not an element of the offense. Doc. 171 at 3. It also denied the government's request for special verdicts, finding special verdicts unnecessary and inappropriate. Doc. 171 at 3. However, the district court went on to treat the government-chosen 18 stories as proxies for McCoy's work as a whole, which it did not represent that it had read. Doc. 171 at 6.

41

"When considering an argument that an indictment was constructively amended, we are required to determine whether the prosecutor's actions or the court's instructions, viewed in context, resulted in the expansion of an indictment either literally or in effect." *United States v. Behety*, 32 F.3d 503, 508-09 (11th Cir. 1994) (internal citations omitted). The rule against alteration of charging terms protects a defendant's right to be tried on the charge for which the grand jury found probable cause. *United States v. Weissman*, 899 F.2d 1111, 1114 (11th Cir. 1990).

Here, despite its denial of the government's request for special verdicts, the district court effectively implemented that request by judging only 18 of McCoy's stories, and taking them as stand-ins for the entire 276 "stories" referred to in the indictment, and downloaded by Brant into the Middle District during the time span specified in the indictment. Doc. 171 at 3 and 6; Doc. 1. But, McCoy had a right to be tried for the "obscene fantasy stories" as a whole; that was the unit of decision specified in the indictment and, presumably, the grand jury true billed the case based on its evaluation of all of the stories, as there is nothing to indicate that it passed on only a subset. Doc. 1.

By departing from the terms of the indictment as endorsed by the grand jury the district court rendered a verdict on a crime with which McCoy was not charged – transportation in interstate commerce of the 18 stories cherry-picked by the government. *United States v. Madden*, 733 F.3d 1314, 1318 (11th Cir. 2013)

42

(district court's instructions amended indictment by adding "during and in relation to" language to it); *United States v. Narog*, 372 F.3d 1243, 1249 (11th Cir. 2004) (district court amended indictment by failing to instruct jury that "controlled substances" was synonymous with methamphetamine, as charged); *United States v. Weissman*, 899 F.2d 1111, 1115-16 (11th Cir. 1990) (district court amended indictment by failing to instruct jury that RICO "enterprise" was synonymous with crime family named in indictment).

## Conclusion

Because McCoy was convicted for aiding the dissemination of 18 stories chosen by the government rather than the totality of his stories as alleged by the grand jury in the indictment, the district court constructively amended the indictment. McCoy's conviction should be vacated, and his case remanded for a new trial before a different judge.

## IV.    FRANK MCCOY'S WRITINGS, CONSIDERED AS A WHOLE, POSSESS SERIOUS LITERARY, ARTISTIC, OR POLITICAL VALUE.

### A. Standard of Review

This Court conducts an independent review and evaluation of material judged obscene in light of the *Miller* criteria. *United States v. Bagnell*, 679 F.2d 826, 835 (11th Cir. 1982).

43

### B. The Government Failed to Overcome Uncontroverted Evidence of the Serious Artistic, Literary, and Political Value of McCoy's Work.

The government's case for the obscenity of McCoy's stories consisted chiefly of placing them into evidence. That is certainly a legally permissible approach. *E.g.*, *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56 (1973) ("The films, obviously, are the best evidence of what they represent."); *Ginzburg*, 383 U.S. at 465 ("In the cases in which this Court has decided obscenity questions since Roth, it has regarded the materials as sufficient in themselves for the determination of the question").

Here, however, McCoy presented expert affirmative evidence that his stories and webpage were not, as a whole, obscene. Richardson's detailed testimony explained how McCoy successfully used literary techniques and devices like the creative use of language, character development, intertextuality (the reworking of existing narratives in a new work), parody, spoof, folk tale traditions, and conventions from the science fiction and fantasy genres to build his tales. Tr. 1 at 176-89. He examined how McCoy used those techniques and devices to advance his overarching themes: "the nature of love," "the difference between love and sexuality," "the nature of sexuality," and "the ways in which society in some senses helps us construct and indeed occasionally coerces us to relate sexually to the rest of the world and those around us." Tr. 2 at 17-18.

Richardson further noted McCoy's work also was politically tinged, in that it challenged a sexual culture perceived by the author to be increasingly repressive. Tr. 2 at 18-19. Richardson was emphatic that McCoy's work, viewed as a whole, manifested significant artistic, literary, and political value and was an attempt "to undertake an artistic rendering." Tr. 1 at 180-84; Tr. 2 at 18-19.

The government's critique of Richardson's opinion missed the mark. Significant portions of it were devoted to simply rehashing some of the more lurid passages from McCoy's stories, severed of context, in an attempt to undermine Richardson's careful explications of the literary worth of the stories. *E.g.*, Doc. 159 at 15-16; Doc. 163 at 4-5.

Other criticisms seem to be predicated on misunderstandings of Richardson's testimony or the practice of literary analysis, or both. For example, the government sneered at Richardson's description of McCoy's stories as "basic romance plots" or as featuring "sexual escapades." Doc. 159 at 14-15; Doc. 163 at 4-5. Richardson, however, was simply using the terms of his profession to describe the structure of McCoy's stories, not suggesting, as the government seems to have thought, that the tales were to be likened to the latest Julia Roberts romantic comedy. Tr. 1 at 18-81; Tr. 2 at 16. Nor is the analytical technique of "close reading," wherein the reader reads a book with particular attention to its literary craft, and not just for the entertainment it might provide, somehow inconsistent

45

with the reader's understanding and appreciation of the work or works as a whole, such that Richardon's opinion would somehow be invalidated by his application of the technique to McCoy's work. Doc. 159 at 18; Doc. 161 at 9.

Thus, the posture of the case in this Court is that the government's evidence consists of the content from McCoy's webpage, while McCoy's evidence is the detailed expert testimony of a highly decorated academic that his work is not obscene because it possesses serious artistic, literary, and political value. This case is therefore governed by *Luke Records, Inc. v. Navarro*, 960 F.2d 134 (11th Cir. 1992).

In *Luke*, this Court was called upon to review the declaratory judgment of the district court finding a rap music recording obscene because of its lyrics. *Luke*, 960 F.2d at 135-36. The proponent of the judgment below, the Sheriff of Broward County, Florida, submitted only the recording itself as evidence of its obscenity. *Luke*, 960 F.2d at 136-37. The rap artists, on the other hand, called three expert witnesses who testified at length about the artistic value of the recording. *Luke*, 960 F.2d at 136-37. This Court held:

> The Sheriff concedes that he has the burden of Of proof to show that the recording *is* obscene.  Yet, he submitted no evidence to contradict the testimony that the work had artistic value. A work cannot be held obscene unless each element of the *Miller* test has been met. We reject the argument that simply by listening to this musical work, the judge could determine that it had no serious artistic value.

*Luke*, 960 F.2d at 138-39.

Just as the Sheriff in *Luke* had the burden to prove that the lyrics of the recording rendered it obscene, a burden that he did not carry when he let expert evidence of the recording's artistic value go unchallenged by affirmative counter-evidence, the government here failed to carry its burden to prove McCoy's writing obscene beyond a reasonable doubt when it failed to introduce any affirmative evidence to contravene Richardson's testimony, which established the serious artistic, literary, and political value of McCoy's work as a whole.

## Conclusion

Because the government failed to carry its burden to prove McCoy's work obscene in the face of uncontroverted expert testimony confirming its serious artistic, literary, and political value, this Court should hold that McCoy's work, taken as a whole, is not obscene, vacate McCoy's conviction, and remand his case for entry of a judgment of acquittal.

**CONCLUSION**

For the foregoing reasons, Frank McCoy's conviction should be VACATED and his case REMANDED for entry of a judgment of acquittal or for a new trial before a different judge.

Dated this 2nd day of July, 2014.

*s/ Martin J. Vogelbaum*

MARTIN J. VOGELBAUM
MA State Bar No.  657564
Appellate Counsel for Mr. Frank Russell McCoy
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel:  (478) 207-3443; Fax:  (478) 207-3419
E-mail:  Martin_Vogelbaum@fd.org

48

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I, Martin J. Vogelbaum, appellate counsel for Mr. Frank Russell McCoy, hereby certify that the number of words in this brief, as counted by the Microsoft Office Word 2007-processing system, according to the method described in 11th Cir. R. 32-4, is **<u>10,899</u>** words; which is less than the 14,000 allowed for appellate briefs by Fed. R. App. P. 32(a)(7)(B)(i).

## CERTIFICATE OF SERVICE

I, Martin J. Vogelbaum, appellate counsel of record for the Appellant, Mr. Frank Russell McCoy, hereby certify that I have, on this 2nd day of July, 2014, filed the foregoing *Principal Brief of the Appellant* with the Clerk of Court using the Eleventh Circuit's CMECF system, which will send electronic notification of filing to counsel of record.

I also certify that I caused a copy of the foregoing *Principal Brief of the Appellant* to be served in paper format upon the following, by placing a copy of the same in the United States Mail, postage prepaid, addressed to:  Mr. Frank Russell McCoy, 13781-041, FCI Oakdale, Federal Correctional Institution, P.O. Box 5000, Oakdale, LA 71463.

I further certify that, on the date set forth above, I caused the foregoing submission to be dispatched for filing with the Clerk of Court by Federal Express overnight delivery.

*s/ Martin J. Vogelbaum*
MARTIN J. VOGELBAUM
MA State Bar No.  657564
Appellate Counsel for Mr. Frank Russell McCoy
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel:  (478) 207-3443; Fax:  (478) 207-3419
E-mail:  Martin_Vogelbaum@fd.org

50