No. 13-14350-AA

In the

# United States Court of Appeals
## For the Eleventh Circuit

———————————

UNITED STATES OF AMERICA,
Appellee,

v.

FRANK RUSSELL McCOY,
Defendant-Appellant.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
District Court No. 1:07-cr-00018-WLS-TQL-1 (Sands, J.)

——————————

**BRIEF FOR THE UNITED STATES**

——————————

MICHAEL J. MOORE
United States Attorney

JAMES N. CRANE
Assistant U.S. Attorney
Middle District of Georgia

DAMON KING
Principal Deputy Chief
Child Exploitation and
    Obscenity Section
Criminal Division
U.S. Department of Justice

LESLIE R. CALDWELL
Assistant Attorney General

DAVID A. O'NEIL
Acting Deputy Assistant Attorney General

JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1260
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

*United States v. Frank Russell McCoy*
*No. 13-14350-AA*

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1 and 26.1-2, the

undersigned counsel for the United States of America hereby certifies that the

following is a complete list of persons and entities who have an interest in the

outcome of this case and who were not included in the Certificate of Interested

Persons set forth in the appellant's brief:

Leslie R. Caldwell, Esq.
Assistant Attorney General
Criminal Division, U.S. Department of Justice

David A. O'Neil, Esq.
Acting Deputy Assistant Attorney General
Criminal Division, U.S. Department of Justice

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1260
Washington, D.C. 20530
(202) 307-3766

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose defendant's request for oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................C-1 of 1

STATEMENT REGARDING ORAL ARGUMENT...................................i

TABLE OF AUTHORITIES ........................................................iv

JURISDICTIONAL STATEMENT..............................................1

STATEMENT OF THE ISSUES ................................................1

STATEMENT OF THE CASE ..................................................2

    I.     Course of Proceedings and Dispositions Below................................2

    II.    Statement of the Facts ....................................................2

        A.    Offense Conduct........................................................2

        B.    Indictment................................................................7

        C.    The *Miller* Obscenity Standard...................................7

        D.    Trial........................................................................9

            1.    The Government's Focus on Eighteen Stories ........................9

            2.    The Defense Case...............................................11

        E.    Verdict ....................................................................13

SUMMARY OF ARGUMENT ..................................................16

ARGUMENT ........................................................................19

    I.     The District Court Did Not Err in Concluding that McCoy's
          Stories Lack Serious Literary, Artistic, or Political Value ...............19

        A.    Standard of Review....................................................19

B.    The Evidence Establishes that McCoy's Stories Lack Serious Literary, Artistic, or Political Value ........................................... 22

C.    The District Court Did Not Err in the Manner in Which It Applied the Third Prong of the *Miller* Standard ......................... 32

    1.    The District Court Did Not Clearly Err When It Found that Eighteen of McCoy's Stories Were Representative of All the Stories Collectively ............................................................... 33

    2.    The District Court Did Not Err in Considering McCoy's Purpose in Creating and Disseminating the Stories ............... 38

    3.    The Alleged Errors in Applying the Third *Miller* Prong Do Not Support a New Trial or Remand to a Different District Judge .................................................................................. 40

II.    The Government's Focus On the Eighteen Stories Did Not Constructively Amend the Indictment ........................................... 43

A.    Standard of Review .................................................................... 43

B.    Argument .................................................................................... 44

CONCLUSION ....................................................................................... 47

CERTIFICATE OF COMPLIANCE ........................................................ 48

CERTIFICATE OF SERVICE ................................................................ 49

iii

# TABLE OF AUTHORITIES

## CASES

*ACLU of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ............................................................21, 33

*Adult Video Ass'n v. U.S. Dep't of Justice*,
  71 F.3d 563 (6th Cir. 1995) ..................................................................... 38

*Am. Booksellers v. Webb*,
  919 F.2d 1493 (11th Cir. 1990) ................................................................ 22

*Ashcroft v. ACLU*,
  535 U.S. 564 (2002) ........................................................................... 8, 37

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ............................................................................. 22

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ................................................................. 8

*Bose Corp. v. Consumers Union of United States, Inc.*,
  466 U.S. 485 (1984) ............................................................................. 20

*Flanigan's Enters., Inc. v. Fulton County*,
  596 F.3d 1265 (11th Cir. 2010) ...........................................................21, 33

*Ginzburg v. United States*,
  383 U.S. 463 (1966) ............................................................................. 23

*Hall v. United States*,
  286 F.2d 676 (5th Cir. 1961) ................................................................... 13

*Hamling v. United States*,
  418 U.S. 87 (1974) ........................................................................... 8, 29

*Johnson v. United States*,
  520 U.S. 461 (1997) ............................................................................. 21

*Kaplan v. California,*
   413 U.S. 115 (1973) ...............................................................29, 30, 31, 34

*Keeton v. Anderson-Wiley,*
   664 F.3d 865 (11th Cir. 2011) .................................................... 21

*Kois v. Wisconsin,*
   408 U.S. 229 (1972) ...........................................................23, 27

*Luke Records, Inc. v. Navarro,*
   960 F.2d 134 (11th Cir. 1992)..................................................15, 28, 30, 31

*A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts,*
   383 U.S. 413 (1966) ...........................................................23, 39

*Miller v. California,*
   413 U.S. 15 (1973) ................................................................ passim

*Paris Adult Theatre I v. Slaton,*
   413 U.S. 49 (1973) ...........................................................15, 29

*Penthouse Int'l, Ltd. v. McAuliffe,*
   610 F.2d 1353 (5th Cir. 1980).............................................. passim

*Pinkus v. United States,*
   436 U.S. 293 (1978) ................................................................ 39

*Pope v. Illinois,*
   481 U.S. 497 (1987) ...........................................................22, 41

*Puckett v. United States,*
   556 U.S. 129 (2009) ................................................................ 21

*Roth v. United States,*
   354 U.S. 476 (1957) ................................................................. 9

*Smith v. United States,*
   431 U.S. 291 (1977) ................................................................ 20

*United States v. 12 200-ft. Reels of Film*,
   413 U.S. 123 (1973) .................................................................................. 8

*United States v. Bacon*,
   598 F.3d 772 (11th Cir. 2010).................................................................. 37

*United States v. Bagnell*,
   679 F.2d 826 (11th Cir. 1982)............................................................20, 29

*United States v. Behety*,
   32 F.3d 503 (11th Cir. 1994) ................................................................... 44

*United States v. Bissell*,
   866 F.2d 1343 (11th Cir. 1989).............................................................. 46

*United States v. Brannan*,
   562 F.3d 1300 (11th Cir. 2009)............................................................... 36

*United States v. Brown*,
   415 F.3d 1257 (11th Cir. 2005).............................................................. 20

*United States v. Brown*,
   504 F.3d 99 (D.C. Cir. 2007)................................................................... 46

*United States v. Canady*,
   126 F.3d 352 (2d Cir. 1997).................................................................... 42

*United States v. Chastain*,
   198 F.3d 1338 (11th Cir. 1999).............................................................. 20

*United States v. Dean*,
   635 F.3d 1200 (11th Cir. 2011).............................................................. 26

*United States v. Dodd*,
   347 F.3d 893 (11th Cir. 2003)................................................................... 7

*United States v. Extreme Assocs., Inc.*,
   No. 03-0203, 2009 WL 113767 (E.D. Pa. Jan. 15, 2009)........................... 37

*United States v. Farley*,
   607 F.3d 1294 (11th Cir. 2010) ............................................................. 20

*United States v. Farrell*,
   126 F.3d 484 (3d Cir. 1997)................................................................... 42

*United States v. Grace*,
   367 F.3d 29 (1st Cir. 2004) ................................................................... 13

*United States v. Groner*,
   479 F.2d 577 (5th Cir. 1973) ................................................................. 31

*United States v. Groner*,
   494 F.2d 499 (5th Cir. 1974) ................................................................. 41

*United States v. Gupta*,
   572 F.3d 878 (11th Cir. 2009)............................................................... 43

*United States v. Gutierrez*,
   745 F.3d 463 (11th Cir. 2014)............................................................... 43

*United States v. Hamling*,
   481 F.2d 307 (9th Cir. 1973) ................................................................ 24

*United States v. Keller*,
   916 F.2d 628 (11th Cir. 1990)............................................................... 44

*United States v. Linetsky*,
   533 F.2d 192 (5th Cir. 1976) ................................................................ 20

*United States v. McCoy*,
   937 F. Supp. 2d 1368 (M.D. Ga. 2013).................................................. 13

*United States v. McCoy*,
   937 F. Supp. 2d 1374 (M.D. Ga. 2013).................................................. 13

*United States v. Merrill*,
   746 F.2d 458 (9th Cir. 1984) ................................................................ 23

vii

*United States v. Miller*,
    471 U.S. 130 (1985) ................................................................ 45

*United States v. Ochoa*,
    526 F.2d 1278 (5th Cir. 1976) ................................................ 13

*United States v. Pinner*,
    561 F.2d 1203 (5th Cir. 1977) ................................................ 41

*United States v. Prophete*,
    522 Fed. Appx. 583 (11th Cir. 2013) ...................................... 46

*United States v. Ramirez-Chilel*,
    289 F.3d 744 (11th Cir. 2002) ................................................ 33

*United States v. Rodriguez-Lopez*,
    363 F.3d 1134 (11th Cir. 2004) .............................................. 35

*United States v. Rogers*,
    474 Fed. Appx. 463 (7th Cir. 2012) ....................................... 24

*United States v. Ross*,
    131 F.3d 970 (11th Cir. 1997) ................................................ 36

*United States v. Schein*,
    31 F.3d 135 (3d Cir. 1994) .............................................. 23, 25

*United States v. Slepicoff*,
    524 F.2d 1244 (5th Cir. 1975) ................................................ 29

*United States v. Stevens*,
    559 U.S. 460 (2010) ............................................................ 8, 27

*United States v. Thevis*,
    484 F.2d 1149 (5th Cir. 1973) ............................................ 7, 29

*United States v. Torkington*,
    874 F.2d 1441 (11th Cir. 1989) .............................................. 43

*United States v. Various Articles of Obscene Merchandise, Schedule No. 1769*,
600 F.2d 394 (2d Cir. 1979) ........................................................ 38

*United States v. Various Articles of Obscene Merchandise, Schedule No. 2098*,
536 F. Supp. 50 (S.D.N.Y. 1981) ................................................ 37

*United States v. Vernon*,
723 F.3d 1234 (11th Cir. 2013) ............................................ 21, 45

*United States v. Ward*,
486 F.3d 1212 (11th Cir. 2007) ............................................ 44, 46

*United States v. Weissman*,
899 F.2d 1111 (11th Cir. 1990) .................................................. 46

## STATUTES AND RULES

18 U.S.C. § 1462 ...................................................... passim

18 U.S.C. § 3231 ............................................................ 1

18 U.S.C. § 922(g) ........................................................ 46

28 U.S.C. § 1291 ............................................................ 1

47 U.S.C. § 230(f)(2) ...................................................... 7

Fed. R. App. P. 4(b)(2) .................................................... 1

Fed. R. Crim. P. 23 ........................................................ 9

Fed. R. Crim. P. 23(c) .................................................... 13

Fed. R. Crim. P. 29 ....................................................... 13

Fed. R. Crim. P. 52 ....................................................... 41

Fed. R. Crim. P. 52(b) .................................................... 21

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of conviction and sentence in a criminal case. The district court exercised jurisdiction under 18 U.S.C. § 3231 and entered judgment on August 12, 2013. Dkt. 189.[1] The defendant filed a timely notice of appeal on August 22, 2013. Dkt. 192; *see* Fed. R. App. P. 4(b)(2). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in finding that McCoy's stories, taken as a whole, lack serious artistic, literary, or political value, specifically:

   a.    Whether the expert opinion testimony offered by the defense compels the conclusion that the stories possess serious artistic, literary, or political value.

   b.    Whether the district court erred—when assessing whether the stories lack serious artistic, literary, or political value—in (1) making a factual finding that 18 of the stories were representative of all the stories collectively; and (2) taking into account McCoy's purpose in creating and disseminating the stories.

---

[1] "Dkt." refers to district court docket entries. "1/12/10 Tr. [page #]" and "1/13/10 Tr. [page #]" refer to the sealed unredacted transcripts of the two-day bench trial. Those transcripts are included in the sealed expanded record excerpts filed by McCoy. "GX" refers to government exhibits admitted at the trial.

1

2.    Whether the government constructively amended the indictment by focusing its trial presentation on 18 of McCoy's stories.

## STATEMENT OF THE CASE

### I.    Course of Proceedings and Dispositions Below

Defendant Frank McCoy posted on the Internet, for others to download, highly detailed and graphic stories that described, among other things, the sexual abuse and rape of prepubescent children. *See infra* pp. 2-6. Following a two-day bench trial, McCoy was convicted of using an interactive computer service for the transportation of obscene material in interstate and foreign commerce, in violation of 18 U.S.C. § 1462. Dkt. 171. He was sentenced to 18 months of imprisonment, to be followed by two years of supervised release. Dkt. 189. The district court initially granted McCoy release pending appeal, Dkt. 198, but on March 25, 2014, the court revoked McCoy's release after he was found to be in possession of child pornography, Dkt. 225. McCoy is therefore currently incarcerated.

### II.    Statement of the Facts

#### A.    Offense Conduct

From his home in Minnesota, Frank McCoy maintained a website, at young-stuff.com, where he posted over 200 stories that he authored or edited and that described in graphic and explicit detail the sexual abuse, rape, and

2

torture of young children. *See* 1/12/2010 Tr. 32, 67-72, 91-94; GX 1, 17B.
McCoy initially wrote the stories for his own personal enjoyment but later
published them on the Internet when he found out there were others who also
had a desire to read them. *See* GX 1, at 1. The website provided a link for
visitors who wanted to access the stories. *See* GX 1, 17B; 1/12/2010 Tr. 27-29.
Clicking on the link brought up a page that listed the stories by title, together
with brief descriptions. GX 17C; 1/12/2010 Tr. 93. A visitor could then click
on a title and pull up the respective story. *Id.* The website also contained links
to other "mirror sites" where visitors could access McCoy's stories. GX 1, 17B;
1/12/2010 Tr. 92-93, 129.

The website depicted a drawing of a man and woman apparently
engaging in sexual intercourse and stated that "[t]his is the private page of
Frank McCoy, containing his stories and helpful information." GX 1, at 1; *see
also* GX 17B. The website explained that the stories "mostly involve incest,"
"pedophilia," and "pregnancy." *Id.* According to the website, the "stories (with
a few notable exceptions) are usually completely consensual (That means that
all parties involved *want* to do whatever they are doing.) and are basically love-
stories." *Id.* (emphasis in original). The website claimed that "[e]ven though
most people might consider this 'abuse,' nobody (with the above noted
exceptions) gets abused in [McCoy's] stories." *Id.* Stated more graphically, "[i]f

3

a little girl has sex, (gets fucked) it's because *she* wants to get fucked, and asks

for it." *Id.* (emphasis in original). "This may be unrealistic," the website

claimed, "but these are stories, *FANTASIES*, they are *not* intended as examples

of the real world, or suggestions of things to do." *Id.* (emphasis in original).

The website also mentioned McCoy's "own personal website," separate from

his "story site," and provided an email address so that those interested in

viewing the personal site could contact McCoy. *Id.* at 3.

McCoy's young-stuff.com website came to the attention of federal law

enforcement officers in or around 2004, when agents were conducting a

separate investigation and found 18 stories downloaded from the website on a

suspect's computer. 1/12/2010 Tr. 25-26. As a result, on March 22, 2005, an

agent stationed in Albany, Georgia, Special Agent Cory Brant, visited the

young-stuff.com website and downloaded the accessible stories, which

numbered over 200. 1/12/2010 Tr. 26-33; *see* GX 3.[2] Among the stories Agent

Brant downloaded were the 18 stories that agents had come across in the prior

investigation. 1/12/2010 Tr. 33-35; GX 4 (summary of 18 stories).

---

[2] The stories downloaded by Special Agent Brant on March 22, 2005, were admitted into evidence on a CD marked as Government Exhibit 3. *See* 1/12/2010 Tr. 29-32; GX 2 (summary of stories downloaded on March 22, 2005, and contained in Government Exhibit 3). The government has filed a motion requesting permission to lodge a copy of Government Exhibit 3 with the Clerk of the Court.

4

Those 18 stories contained graphic and lewd descriptions of sexual conduct involving young children, generally with family members. *See* GX 5A through GX 5R (hard copies of the 18 stories); 1/12/2010 Tr. 36-40. The story entitled "But Daddy," for example, described a father having vaginal intercourse and ejaculating inside the cervix of his 6-year-old daughter. GX5A. The story "Daddy, Please" described a father having oral sex, ejaculating into the mouth of, digitally and vaginally penetrating, and performing oral sex on his 6-year-old-daughter. GX 5C. "Rapesuzy" described a father having vaginal intercourse with his daughter and torturing and murdering her in the process. GX 5N. "Teaching Little Lisa" described an adult uncle masturbating and fondling and having vaginal intercourse with his 4-year-old niece while the girl's mother and father masturbated and videotaped the sexual abuse. GX 5R.

Also on March 22, 2005, Special Agent Brant, acting in an undercover capacity, emailed McCoy at the address provided on young-stuff.com and requested access to McCoy's personal website. GX 6; 1/12/2010 Tr. 40-42. McCoy responded that he no longer maintained a personal website because of the cost but could email a file containing the contents of the old website. GX 6.[3] McCoy also said that in addition to young-stuff.com, his stories could be

---

[3] According to McCoy, the personal website contained a description of himself, an old copy of his resume, some links to websites he found interesting,

accessed at (1) ftp://ftp.asstr.org/pub/Authors/Frank_McCoy/index.HTM, and (2) http://www.mrdoubleena.com/htm/frank/index.htm. GX 6. McCoy explained that the "ASSTR site [was] the one [he] personally update[d] all the time" and that "[r]ight now, the young-stuff site is not *nearly* as up-to-date." GX 6.

Agent Brant subsequently visited the asstr.org and mrdoubleena.com websites and on two occasions downloaded the stories accessible on those sites. 1/12/2010 Tr. 44-49; *see* GX 9, 11.[4] Those stories were largely the same as those available on young-stuff.com and contained graphic and explicit descriptions of the sexual abuse, rape, and torture of young children. *See* 1/12/2010 Tr. 46, 49; GX 9, 11. Among the stories downloaded from the asstr.org website were the 18 stories found during the prior investigation and previously downloaded from the young-stuff.com website. *See* GX 4.

---

a few poems, and a game he wrote to show that he could program computers. GX 6.

[4] Special Agent Brant downloaded stories from those websites on August 8, 2006, and January 29, 2008. 1/12/2010 Tr. 44-49. The stories downloaded on August 8, 2006, were admitted into evidence on a CD marked as Government Exhibit 9. *See* 1/12/2010 Tr. 44-46; GX 8 (summary of stories downloaded on August 8, 2006, and contained in Government Exhibit 9). The stories downloaded on January 29, 2008, were admitted into evidence on a CD marked as Government Exhibit 11. *See* 1/12/2010 Tr. 46-49; GX 10 (summary of stories downloaded on August 8, 2006, and contained in Government Exhibit 11). The government has filed a motion requesting permission to lodge a copy of Government Exhibits 9 and 11 with the Clerk of the Court.

6

### B.    Indictment

A federal grand jury returned an indictment (Dkt. 1) charging McCoy with one count of violating 18 U.S.C. § 1462, which prohibits the use of an "interactive computer service . . . for carriage in interstate or foreign commerce . . . any obscene . . . book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character."[5] The indictment alleged that between June 23, 2002, and August 8, 2006, McCoy "did knowingly use"—and "aid and abet others" who used—"an interactive computer service for carriage in interstate and foreign commerce obscene matters." Dkt. 1, at 1. According to the indictment, McCoy used an interactive computer service to send links to three websites that "contained obscene 'fantasy' stories describing in explicit and graphic detail the sexual abuse, rape, and murder of children." Dkt. 1, at 1-2. The indictment specifically alleged that the "obscene stories were downloaded" from the websites "into the Middle District of Georgia and elsewhere." Dkt. 1, at 2.

### C.    The *Miller* Obscenity Standard

The meaning of "obscene" in 18 U.S.C. § 1462 derives from First Amendment law. *See United States v. Thevis*, 484 F.2d 1149, 1155 (5th Cir.

---

[5] The term "interactive computer service" is defined in 47 U.S.C. § 230(f)(2) and encompasses the Internet. *United States v. Dodd*, 347 F.3d 893, 899-900 & n.8 (11th Cir. 2003).

1973).[6] The First Amendment generally prohibits the punishment of speech based on its content except for speech in certain historically unprotected categories, including obscenity. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468-69 (2010). As a result, in order to avoid doubt as to their constitutionality, federal obscenity statutes, such as 18 U.S.C. § 1462, are construed to reach only material that qualifies as unprotected obscenity under the First Amendment. *Ashcroft v. ACLU*, 535 U.S. 564, 581 n.11 (2002); *Hamling v. United States*, 418 U.S. 87, 113-14 (1974); *United States v. 12 200-ft. Reels of Film*, 413 U.S. 123, 130 n.7 (1973).

The Supreme Court set forth the controlling definition of obscenity in *Miller v. California*, 413 U.S. 15 (1973). *Miller* held that the First Amendment allows the regulation of "works [1] which, taken as a whole, appeal to the prurient interest in sex, [2] which portray sexual conduct in a patently offensive way, and [3] which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 22. The Court explained that the "basic guidelines for the trier of fact must be":

---

[6] This Court has adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

(a)    whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest;[7]

(b)    whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state [or federal] law; and

(c)    whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24 (internal citations and quotation marks omitted). Thus, in a prosecution under 18 U.S.C. § 1462, the government must prove beyond a reasonable doubt that the material at issue satisfies each of these three elements. *See Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1363 (5th Cir. 1980); Eleventh Cir. Crim. Pattern Jury Instr. 56 (2010).

**D.    Trial**

McCoy waived his right to a jury trial. 1/12/10 Tr. 9-10. He was therefore tried before the district court in accordance with Fed. R. Crim. P. 23.

**1.    The Government's Focus On Eighteen Stories**

The parties stipulated to facts establishing each element of the charged offense except the obscenity element. *See* Dkt. 143, at 2-3; Dkt. 145; Dkt. 171,

---

[7] A work appeals to the prurient interest in sex if it "has a tendency to excite lustful thoughts" or appeals to a "shameful or morbid interest in nudity, sex, or excretion." *Roth v. United States*, 354 U.S. 476, 488 n.20 (1957) (internal citation and quotation marks omitted).

9

at 4-5.[8] The government offered into evidence all of the stories retrieved from

McCoy's websites, totaling approximately 276 stories, *see* GX 3, 9, 11, but

focused its trial presentation on the 18 stories that prompted the investigation

and that Special Agent Brant downloaded from both the young-stuff.com and

asstr.org websites, Dkt. 159, at 9-10; *see* GX 4.[9] The government urged the

court to render a special verdict with respect to each of the 18 stories, *see* Dkt.

141, at 3; 1/12/2010 Tr. 33-34, but stated that the Court could find McCoy

guilty if it found obscene any one of the individual stories posted by McCoy

and downloaded by federal agents, Dkt. 159, at 7 n.3; Dkt. 162, at 4-5.

   McCoy objected to the government's proposed approach. He contended

that the government constructively amended the indictment by requesting a

special verdict and focusing on the 18 stories. Dkt. 160. All 240 stories

downloaded by Agent Brant in 2006 and 2008 "were the subject of a single-

---

[8] According to this Court's pattern jury instructions, in order for a
defendant to be found guilty of violating 18 U.S.C. § 1462, the government
must prove "(1) the Defendant knowingly used or caused to be used [an
interactive computer service] to transport in interstate commerce certain
materials described in the indictment; (2) when the materials were transported,
the Defendant knew the general sexual nature of the material's content; and (3)
the material was legally obscene." Eleventh Cir. Crim. Pattern Jury Instr. 56
(2010).

[9] By the government's count, there were 276 of McCoy's stories admitted
into evidence. *See* Dkt. 144, at 1, 3, 9. The defense counted 240 stories
downloaded by investigators during the time period alleged in the indictment.
*See* Dkt. 160 nn.2-3; 1/12/2010 Tr. 165, 180, 184.

10

count-indictment," McCoy argued, and focusing on a subset of these stories

"broaden[ed] the possible bases for conviction." Dkt. 160, at 5. McCoy also

argued that the governing definition of obscenity from *Miller* required that the

district court consider all 240 stories collectively and determine whether those

stories, taken as a whole, qualified as obscene. Dkt. 143, at 3-4; Dkt. 160, at 9-

12; *see generally* Dkt. 161 (Defendant's Closing Argument).

### 2.    The Defense Case

In support of his contention that the stories were not obscene, McCoy

introduced expert testimony from Gary Richardson, Ph.D., a professor and

chair of the English department at Mercer University, who specialized in

nineteenth-century drama. 1/12/2010 Tr. 167-189; 1/13/2010 Tr. 4-62; *see*

Dkt. 161, at 3-13 (Defendant's Closing Argument). Richardson testified that he

did a close reading of all 240 stories and, in his opinion, those stories had

"serious literary value" under a "narrow definition of literary value."

1/13/2010 Tr. 18-19; *see* 1/12/2010 Tr. 180-82, 184-85; *see also* 1/13/2010 Tr.

22 ("[F]rom the standards of people who study literature, his stories would

manifest serious literary value . . . ."). According to Richardson, it is difficult

to judge the literary value of the 240 stories as a whole based on the 18 stories

that were the focus of the government's presentation because those stories were

relatively shorter than others in McCoy's collection. 1/13/2010 Tr. 9-10.

11

Richardson testified that McCoy's stories contain "basic romance plots" and "raise significant issues, cultural and political issues." 1/12/2010 Tr. 180-81. According to Richardson, the stories raise "three interrelated themes and then a kind of political thematic," 1/13/2010 Tr. 18, namely (1) "the nature of love," *id.*; (2) "the relationship between love and sexuality," *id.*; (3) "the ways in which society in some senses helps us construct and indeed occasionally coerces us to relate sexually to the rest of the world and those around us," *id.*; and (4) how "we define sexuality in our culture and what are its acceptable parameters," 1/12/2010 Tr. 180-81; *see* 1/13/2010 Tr. 18 ("[T]here's a political theme here that our culture has become increasingly more repressive in terms of sexual mores over the last at least 40 years, and Mr. McCoy's stories seem to insist that that conversation needs to be reopened with some degree of seriousness[.]").

Richardson also testified that McCoy's stories, "despite the general focus on one or two standard plots, suggest[] an attempt to bring to bear literary devices, mechanisms, forms in such a way as to make a serious effort at speaking to the topics in a way that reflects serious thought and serious artistry." 1/13/2010 Tr. 4. Specifically, McCoy employed "reader entrapment," 1/12/2010 Tr. 184-86; 1/13/2010 Tr. 14; "intertextuality," 1/12/2010 Tr. 187; the "interpolated tale," 1/12/2010 Tr. 187; "parody and

12

spoof," 1/13/2010 Tr. 11-14; "inversion," 1/13/2010 Tr. 6, 10-11, 14; and the "dramatic point of view," 1/13/2010 Tr. 17. Richardson testified that McCoy also narrated the stories from numerous points of view, 1/13/2010 Tr. 16; maintained an appropriate voice and language for particular characters, 1/12/2010 Tr. 187-88; and employed different genres, such as science fiction, folk tales, and the "traditional romance formula," 1/13/2010 Tr. 16-17.

### E.     Verdict

The district court found McCoy guilty. Dkt. 171, at 13. The court expressed its verdict in two orders, a "Bench Opinion," *United States v. McCoy*, 937 F. Supp. 2d 1374 (M.D. Ga. 2013) (Dkt. 171), and an order denying McCoy's motion for judgment of acquittal under Fed. R. Crim. P. 29, *United States v. McCoy*, 937 F. Supp. 2d 1368 (M.D. Ga. 2013) (Dkt. 170).[10]

---

[10] Neither opinion was required. At a bench trial, a defendant need not file a Rule 29 motion to challenge the sufficiency of the evidence. *Hall v. United States*, 286 F.2d 676, 678 (5th Cir. 1961). "The plea of not guilty asks the court for a judgment of acquittal, and a motion to the same end is not necessary." *Id.* "The district court must conduct the same analysis of the law and the evidence whether it evaluates a motion for acquittal under Rule 29 or adjudicates a not guilty plea." *United States v. Grace*, 367 F.3d 29, 34 (1st Cir. 2004). Moreover, at a bench trial in a criminal case, a district court is not required to express its verdict in a written opinion. The court must "state its specific findings of fact in open court or in a written decision or opinion" only if "a party requests before the finding of guilty or not guilty." Fed. R. Crim. P. 23(c). It does not appear that McCoy requested findings in this case. *See United States v. Ochoa*, 526 F.2d 1278, 1282 n.6 (5th Cir. 1976) (special findings waived if not specifically requested).

The court rejected McCoy's contention that the government's request for a special verdict constructively amended the indictment. Dkt. 171, at 2-3. The government's request did "not require any deviation from the factual allegations within the indictment," the court concluded, and "the number of obscene matters transported is not an element of the crime" under 18 U.S.C. § 1462. Dkt. 171, at 3.

The court nonetheless rejected the government's request for a special verdict on each of the 18 stories. Dkt. 171, at 3. "In light of the facts of this case," the court reasoned, "a special verdict is neither appropriate nor necessary." Dkt. 171, at 3. Instead, as requested by McCoy, the court assessed whether all of McCoy's stories, considered as a whole, were obscene under the *Miller* obscenity standard. *See* Dkt. 171, at 3, 6-7, 12. In conducting that analysis, the court concluded that, "based on the testimony provided at trial and [McCoy's] own characterizations of his stories," the 18 stories that were the focus of the government's presentation were a representative sample of McCoy's stories as a whole. Dkt. 171, at 6.

As relevant here, the court concluded that the government proved the third prong of the *Miller* obscenity standard beyond a reasonable doubt. Dkt. 171, at 5-6, 9-12. The court concluded that Richardson's "critical analysis" of the stories could not "redeem [McCoy's] work." Dkt. 171, at 12. The court

14

"simply [could not] find that the content of [McCoy's] works provide serious literary, artistic, politic[al], or scientific value." *Id.* Even if McCoy "sought to incite political discourse and provide artistic commentary on society as Professor Richardson suggest[ed]," the court could "find no literary value within the murk of rape, incest, abuse, molestation, and vivid descriptions of the violations of children as composed within [McCoy's] work." Dkt. 171, at 12. "Most importantly," the court concluded, there was nothing in the record "to support a finding that [McCoy's] purpose was artistic, scientific or political." *Id.* To the contrary, the record "establishes a clear purpose to appeal to prurient interest, especially with prepubescent female children." *Id.*

The court rejected McCoy's contention that he was entitled to acquittal because the government did not introduce evidence to rebut Richardson's expert opinion testimony. Dkt. 170, at 2. "[T]he Supreme Court made clear" in *Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973), the district court explained, "that no discrete burden to present affirmative expert evidence would be placed upon the prosecution when the documents themselves are available to the fact finder for review." Dkt. 170, at 5.

The court distinguished *Luke Records, Inc. v. Navarro*, 960 F.2d 134 (11th Cir. 1992) (per curiam), where the defendant, but not the government, presented expert evidence regarding the artistic value of the album "As Nasty

15

As They Wanna Be" by 2 Live Crew, and this Court concluded that the evidence was insufficient to support a finding that the album was obscene. *Navarro* involved "musical compositions," the district court observed, "which . . . arguably 'possesse[] inherent artistic value,'" whereas "words on a page do not possess intrinsic literary value just because they are arranged in a widely accepted literary form." Dkt. 170, at 7 (quoting *Navarro*, 960 F.2d at 135). The district court concluded that no specialized knowledge was necessary to ascertain whether McCoy's "stories, taken as a whole, lack serious artistic, scientific, literary, or political value." Dkt. 170, at 6-7. "Unlike *Navarro*," the court determined, "the instant case provides a textbook example of an obscenity case for which affirmative evidence, specifically expert affirmative evidence, would not be needed." Dkt. 170, at 6.

## SUMMARY OF ARGUMENT

1.    The district court correctly concluded that McCoy's stories, taken as a whole, lack serious artistic, literary, political, or scientific value.

a.    The evidence at trial amply supported the district court's verdict. McCoy's stories overwhelmingly contain crude and graphic descriptions of sex, mostly involving sex among family members and with minors. The stories are devoid of artistic, literary, or political value. Their dominant, if not sole, intended function—as evidenced by McCoy's purpose in

16

creating the stories and the manner in which he disseminated them over the Internet—was to appeal to the prurient interest in sex. The stories are precisely the type of hardcore pornography that is unprotected under the First Amendment.

The opinion testimony of McCoy's expert witness, Professor Gary Richardson, does not support—let alone compel—a contrary conclusion. Superficial similarities between McCoy's stories and classic works of literature, as purportedly discerned by Richardson, do not elevate the stories to the status of serious art. The stories also do not possess serious political value merely because, as Richardson opined, they push against contemporary mores about sex. All obscenity by definition breaches community standards regarding the acceptable depiction or description of sexual conduct; such content alone does not transform a work into political speech. Moreover, even if it is assumed that the stories possess artistic, literary, or political value, as opined by Richardson, that value is minimal and far outweighed by the patently offensive sexual content contained in the stories. The stories, taken as a whole, do not possess serious artistic, literary, or political value.

b.    The district court correctly applied the third prong of the *Miller* obscenity standard. *First*, the district court—as urged by McCoy—defined the stories collectively as the "work" that had to be "taken as a whole" to assess

17

whether it lacks serious artistic, literary, or political value. The district court did not clearly err in making a factual finding that the 18 stories that were the focus of the government's trial presentation were representative of McCoy's stories generally. *Second*, the district court did not privilege McCoy's purpose in creating the stories above and beyond the actual content of the stories. The court first assessed the content of the stories and on that basis concluded that the stories lack artistic, literary, and political value. Only then did the court consider McCoy's purpose. And the court made clear that its assessment of McCoy's purpose was not a dispositive factor in its analysis, explaining that even if McCoy had an artistic or political purpose in creating the stories, as opined by Richardson, that purpose could not be discerned among the patently offensive content in the stories. *Third*, assuming *arguendo* that the district court erred in the manner in which it applied the third part of the *Miller* test, a remand to the district court—much less a retrial—is not warranted. If this Court concludes that the district court erred in the manner alleged by McCoy, it can—and should—independently perform the analysis it deems correct and affirm McCoy's conviction. An independent review of the record establishes that McCoy's stories lack serious artistic, literary, or political value.

2.    There was no constructive amendment of the indictment.

Consistent with the indictment, the evidence established—and the district

18

court found—that the stories McCoy posted on the Internet, taken as a whole, were obscene. The evidence at trial and the district court's consideration of that evidence therefore corresponded fully with the allegations in the indictment. Even if the district court had returned a special verdict on 18 of those stories, as urged by the government, there still would have been no constructive amendment. An indictment is not constructively amended where the proof at trial is narrower than the allegations in the indictment.

## ARGUMENT

### I.    The District Court Did Not Err in Concluding that McCoy's Stories Lack Serious Literary, Artistic, or Political Value

McCoy contends (Br. 43-47) that the evidence did not support the district court's conclusion that his stories lack serious artistic, literary, or political value, particularly in light of Richardson's expert opinion testimony. He also contends (Br. 27-40) that the district court erred in the manner in which it applied the third prong of the *Miller* obscenity standard. McCoy's arguments do not withstand scrutiny.

### A.    Standard of Review

This Court will, as a general matter, affirm the sufficiency of the evidence supporting a guilty verdict at a bench trial if any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt. *United States v. Farley*, 607 F.3d 1294, 1333 (11th Cir. 2010); *United States v. Brown*, 415 F.3d 1257, 1270-71 (11th Cir. 2005). The Court views the evidence in the light most favorable to the verdict and will uphold a conviction unless the district court "could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999).

In obscenity prosecutions, however, appellate courts conduct "an independent review of the material in question and an independent evaluation of the material in light of the *Miller* criteria," *United States v. Bagnell*, 679 F.2d 826, 835 (11th Cir. 1982), to ensure that the judgment does not intrude on First Amendment rights.[11] The Supreme Court has specifically deemed the third prong of the *Miller* obscenity standard to be "particularly amenable to appellate review." *Smith v. United States*, 431 U.S. 291, 305 (1977). This Court accordingly conducts an independent review to determine whether the material alleged to be obscene possesses serious literary, artistic, political, or scientific value. *Penthouse*, 610 F.2d at 1364.

In conducting an independent review, this Court reviews the district court's findings of "constitutional fact" *de novo* and findings of "historical fact"

---

[11] *Accord United States v. Linetsky*, 533 F.2d 192, 201-02 (5th Cir. 1976); *see Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 504-07 (1984); *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1364 (5th Cir. 1980).

for clear error. *See, e.g.*, *Flanigan's Enters., Inc. v. Fulton County*, 596 F.3d 1265, 1275-76 (11th Cir. 2010). Historical facts "are the 'who, what, where, when, and how of the controversy,'" whereas "constitutional facts are the 'crucial' or 'ultimate' facts" that determine whether First Amendment rights are implicated. *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011) (quoting *ACLU of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1205-06 (11th Cir. 2009)).

Unpreserved arguments are forfeited and reviewed for plain error. Fed. R. Crim. P. 52(b); *see, e.g.*, *United States v. Vernon*, 723 F.3d 1234, 1260-61 (11th Cir. 2013). To obtain relief on plain error review, a defendant must show (1) "an error or defect," (2) that is "clear or obvious, rather than subject to reasonable dispute," and (3) which "affected the outcome of the district court proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (internal citations and quotation marks omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks and alteration omitted).

21

### B.    The Evidence Establishes that McCoy's Stories Lack Serious Literary, Artistic, or Political Value

The third prong of the *Miller* obscenity standard requires the finder of fact to determine whether a "reasonable person" "would find serious literary, artistic, political, or scientific value in [the] allegedly obscene material. *Pope v. Illinois*, 481 U.S. 497, 500-01 (1987). The work need not be "utterly without redeeming social value," a standard that would require the "prosecution to prove a negative" and would be "virtually impossible" for the government to prove beyond a reasonable doubt. *Miller*, 413 U.S. at 22; *see id.* at 24-25. It suffices if the work does "not have *serious* literary, artistic, political, or scientific value." *Id.* at 22 (emphasis added); *see also Am. Booksellers v. Webb*, 919 F.2d 1493, 1503 n.18 (11th Cir. 1990) ("*Miller* relaxed the third prong of the obscenity test and allowed the government to regulate material that satisfies the other two prongs of the test and has little or no value to society.").

The work must be considered "as a whole." *Miller*, 413 U.S. at 24. A work is not necessarily obscene if one portion could be deemed to lack societal value[12] when considered separately and in isolation. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 248-49 (2002); *see Penthouse*, 610 F.2d at 1372 (issue of *Playboy* magazine not obscene even though it "contains items which, standing

---

[12] For ease of reference, we use "societal value" as shorthand for "artistic, literary, political, or scientific value."

22

alone, would be found obscene"). Conversely, "[a] quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication." *Kois v. Wisconsin*, 408 U.S. 229, 231 (1972); *see United States v. Schein*, 31 F.3d 135, 137 (3d Cir. 1994) (videos showing sexual conduct found obscene even though the depicted participants "wear condoms and the viewers are reminded, from time to time, to have 'safe sex'"); *United States v. Merrill*, 746 F.2d 458, 464 (9th Cir. 1984) ("[A]ttaching the political letter with the obscene pictures . . . does not save the mailing as a whole.").

The work as a whole must also be considered in the larger "context of the material." *Kois*, 408 U.S. at 231; *see Ginzburg v. United States*, 383 U.S. 463, 465-66 (1966) ("We agree that the question of obscenity may include consideration of the setting in which the publications were presented as an aid to determining the question of obscenity . . . ."). A work intended and used solely to appeal to the prurient interest of those who find it sexually arousing may lack serious societal value, for example, even if it might possess societal value when used to educate or in an attempt at serious art. *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts*, 383 U.S. 413, 420-21 (1966); *see Kois*, 408 U.S. at 231 ("[C]onsidering the poem's content and its placement amid a selection of poems in the interior of a newspaper, we believe that it bears some of the earmarks of an attempt at serious art."); *United States*

23

*v. Rogers*, 474 Fed. Appx. 463, 470 (7th Cir. 2012) (unpublished) (image

deemed to lack societal value where it was sent by defendant "to emphasize his

desire to have sex with [the recipient] and to encourage her to have sex with

him," not "to engage [the recipient] in scientific discussion on human anatomy

or an academic discourse on teenage sexual activity"); *United States v. Hamling*,

481 F.2d 307, 320 (9th Cir. 1973) ("portrayals of female genitalia being

stimulated with a vibrator" would likely be "pure hard core pornography" if

considered in isolation but "become non-obscene when communicated in the

context of a pictorial adjunct to educational text"), *aff'd*, 418 U.S. 87 (1974).

    The district court correctly concluded that McCoy's stories, considered

as a whole, lack serious artistic, literary, or political value.[13] The overwhelming

focus of the stories is crude and graphic descriptions of offensive sexual

conduct, mostly incest involving minors. For example, the story "But

Daddy!"contains a lewd first-person description of a man having sex with his

six-year-old daughter. *See* GX 5A. The father describes his daughter's "wide-

eyed astonishment, each time she found out that she really COULD take her

own father's swollen prick all the way up inside her cervix" and states that this

"made [her] tight little snatch clamp down that much harder around my

---

    [13] McCoy does not claim—and did not claim in the district court—that
his stories possess scientific value.

swollen prick." GX 5A, at 1. According to the narrator, "[t]he sight of my engorged penis vanishing into the first-grader's body, making her tummy swell with each stroke inside her, was enough to make a eunuch squirt sperm." *Id.* McCoy's other stories contain the same types of descriptions, language, and subject matter. *See generally* GX 3, 9, 11. These stories are not serious works of art or literature, let alone political tracts. They are precisely the type of "'hard core' pornography," *Miller*, 413 U.S. at 29, that the Supreme Court has made clear is unprotected under the First Amendment.

Richardson's expert testimony does not support, let alone compel, a finding that McCoy's stories possess serious artistic, literary, or political value. According to Richardson, the stories utilize established literary devices—such as "reader entrapment" and "inversion of expectations"—and address themes involving love and sexuality. *See supra* pp. 11-13. On this basis, Richardson compared McCoy's stories to classic works by Jonathan Swift, Mark Twain, and Aristophanes, among others. *See* 1/12/2010 Tr. 185-86; 1/12/2010 Tr. 13-14. But passing similarities to serious art do not elevate a work to that status. Thus, in *United States v. Schein*, *supra*, the Third Circuit rejected the defendant's attempt to equate the materials he distributed—videos depicting sexual conduct "among homosexual males" involving "urination"—with "photographs of 'urolagnic' pornography by Robert Mapplethorpe [that] were

25

shown at an exhibit funded by the government's National Endowment of the Arts." 31 F.3d at 136-37. McCoy's stories similarly are not works of art merely because they can be said to bear a superficial resemblance to works that indisputably possess substantial artistic merit.

Richardson's identification of political value in McCoy's stories is also flawed. Richardson opined that the stories possess political value because they "rais[e] issues about sexuality," 1/13/2010 Tr. 47, in particular the "acceptable parameters" of "sexuality in our culture," 1/12/2010 Tr. 181. By definition, however, obscenity transgresses the bounds of "contemporary community standards" with respect to how sexual conduct should be described or depicted. *United States v. Dean*, 635 F.3d 1200, 1205, 1207 (11th Cir. 2011). As a result, all works of obscenity could arguably be deemed to question and challenge contemporary mores about sex. Richardson's definition of political value would therefore preclude any material whatsoever from falling within the *Miller* definition of obscenity. That obviously is not the case.

Moreover, McCoy's stories satisfy the third prong of the *Miller* obscenity standard even if it is assumed—as opined by Richardson—that they possess some modicum of artistic, literary, or political value. Under the third prong, a work falls outside the definition of obscenity only if "taken as a whole" it possesses "serious" societal value. *Miller*, 413 U.S. at 24. Limiting this

26

"exception to 'serious' value ensure[s] that [a] quotation from Voltaire in the flyleaf of a book [would] not constitutionally redeem an otherwise obscene publication." *Stevens*, 559 U.S. at 479 (quoting *Miller* and *Kois*, *supra*; internal quotation marks omitted). Any societal value possessed by McCoy's stories is similarly *de minimis* and dwarfed by the patently offensive descriptions of sexual conduct contained in the stories. In fact, it is clear from the content of the stories, and their context, that their dominant—if not sole—intended function was to appeal to the prurient interest of those who would find the stories sexually arousing. McCoy's stories taken as a whole do not possess serious artistic, literary, or political value.

This Court's decision in *Penthouse*, *supra*, is instructive. The Court concluded that two magazines, separate issues of *Penthouse* and *Oui*, each contained articles possessing societal value. 610 F.2d at 1371. The issue of *Penthouse* contained, among other things, "an article about the power and policies of United States Foreign affairs advisor Zbigniew Brzezinski" and an article by a "noted author" entitled "Africa, Jimmy Carter's Vietnam." *Id.* at 1372. The issue of *Oui* contained, among other things, "an article concerning obscenity and the First Amendment" and a feature in which "author Stephen King comment[ed] upon his works." *Id.* The Court nonetheless held that each magazine, considered as a whole, lacked serious literary, artistic, political, or

27

scientific value. *Id.* at 1371-73. The Court concluded that in light of the quantity and quality of the patently offensive material in the magazines they "were not saved by the articles possessing some literary merit." *Id.* at 1372-73. The same holds true here. If the content with societal value in *Penthouse* and *Oui* were not enough to create serious societal value in the magazines as a whole, the questionable social value discerned by Richardson cannot redeem McCoy's stories.

McCoy argues (Br. 46-47) that this Court's decision in *Luke Records*, *supra*, requires his acquittal. In that case, the musical group "2 Live Crew" sought a declaratory judgment that its music album, "As Nasty As They Wanna Be," was not obscene. 960 F.2d at 135. In support, the group offered testimony from four expert witnesses who opined that the album possessed serious artistic value. *Id.* at 136-37. The Broward County Sheriff's Office, which sought to regulate the album as obscenity, introduced no evidence other than the album. *Id.* at 136. The district court found that the recording was obscene under *Miller*, *see* 960 F.2d at 135, but this Court reversed, concluding that the Sheriff's Office failed to prove by a preponderance of the evidence that the musical work lacked serious artistic value, *id.* at 138-39. Relying on this holding, McCoy contends (Br. 47) that "the government here failed to carry its burden to prove [his] writing obscene beyond a reasonable doubt when it failed

to introduce any affirmative evidence to contravene Richardson's [expert] testimony."

The Supreme Court and this Court have repeatedly held, however, that the government need not introduce expert testimony to prove that a work is obscene and can rely solely on the contents of the work.[14] "[E]xpert testimony on the part of the prosecution is not necessary in cases where the materials themselves are available for inspection by the finder of fact." *Thevis*, 484 F.2d at 1153. The parties of course are free to introduce expert testimony. *Kaplan v. California*, 413 U.S. 115, 121 (1973); *Bagnell*, 679 F.2d at 833. Yet even if one or both of the parties introduces expert opinion testimony, the finder of fact is not bound to accept the expert opinion when weighing the evidence. *Hamling*, 418 U.S. at 100. That remains true where, as here, the defense—but not the prosecution—introduces expert opinion testimony with respect to the third

---

[14] *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56 (1973); *Kaplan v. California*, 413 U.S. 115, 121 (1973); *Hamling v. United States*, 418 U.S. 87, 100 (1974); *United States v. Bagnell*, 679 F.2d 826, 835 (11th Cir. 1982); *United States v. Slepicoff*, 524 F.2d 1244, 1247-48 (5th Cir. 1975); *United States v. Thevis*, 484 F.2d 1149, 1153 (5th Cir. 1973). The Supreme Court has reserved judgment on whether expert testimony would be required in an "extreme case . . . where contested materials are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest," *Paris Adult Theatre I v. Slaton*, 413 U.S. at 56 n.6, but that issue is not raised in this case.

prong of the *Miller* standard, *i.e.*, opinion testimony as to the societal value of the material. *Kaplan*, 413 U.S. at 121.

*Luke Records* does not overrule and is consistent with these well-established principles. The Court's conclusion in *Luke Records* was a result of the unique circumstances in that case. Of particular significance was the fact that the allegedly obscene work, the album "As Nasty As They Wanna Be," was a musical recording. The Broward County Sheriff's Office argued that the recording was obscene based on the lyrics, not the music, but this Court concluded that the *Miller* test had to be "applied to the lyrics *and music* . . . as a whole." *Id.* at 136 (emphasis added). And the Court stated that it "tend[ed] to agree" with the contention that music alone can never be declared obscene because "music possesses inherent artistic value." *Id.* at 135. The presence of music as one component of the allegedly obscene work therefore weighed against a finding of obscenity. The expert testimony offered in support of the musical recording further supported that conclusion. Two expert witnesses (music critics) testified that the album was a legitimate example of a valid and recognized musical genre, namely hip hop and rap. *Id.* at 136. Another expert witness testified that the album contained three musical conventions that derived from African-American culture. *Id.* at 137. It was within this context that the Court conducted an "independent review" and concluded that there

30

was an insufficient basis for a finding that "As Nasty As They Wanna Be" lacked serious artistic value. *Id.* at 138-39.

This case is far different from *Luke Records*. McCoy's stories, of course, lack a musical component. And for the reasons stated above, the expert testimony introduced by the defense in this case provides little if any support for the conclusion that McCoy's stories possess serious artistic, literary, or political value. *See supra* pp. 25-28. This case is therefore much more similar to *Kaplan*, *supra*. In that case, the allegedly obscene work consisted of a book that had "only the most tenuous 'plot'" and was "made up entirely of repetitive descriptions of physical, sexual conduct, 'clinically' explicit and offensive to the point of being nauseous." 413 U.S. at 116-17. The defendant, but not the government, introduced expert testimony about the societal value of the book. *Id.* at 117, 121. The Supreme Court concluded that, "[o]n the record in this case, the prosecution's evidence was sufficient, as a matter of federal constitutional law, to support [the defendant's] conviction." *Id.* at 122. The Court confirmed that there is no "constitutional need for 'expert' testimony on behalf of the prosecution, or for any other ancillary evidence of obscenity, once the allegedly obscene material itself is placed in evidence." *Id.* at 121 (citing, *inter alia*, *United States v. Groner*, 479 F.2d 577 (5th Cir. 1973) (en banc)). As in *Kaplan*, the record is sufficient to support McCoy's conviction, and the

31

government was not required to offer evidence to rebut the expert testimony introduced by the defense.

**C.    The District Court Did Not Err in the Manner in Which it Applied the Third Prong of the *Miller* Standard**

In applying the third prong of the *Miller* obscenity standard, the district court assessed whether all of McCoy's stories as a whole lacked serious artistic, literary, political, or scientific value. Dkt. 171, at 3. "[B]ased on the testimony provided at trial and the Defendant's own characterizations of his stories" the court found that the 18 stories that were the focus of the government's trial presentation "represent[ed] the body of work as a whole." Dkt. 171, at 6. The court "carefully considered the facts at bar and the testimony and evidence presented at trial" and concluded that McCoy's stories, taken as a whole, lacked societal value. Dkt. 171, at 12.

The district court rejected the opinion of McCoy's expert witness, Richardson, that the stories possessed serious societal value. Dkt. 171, at 11-12. Even crediting Richardson's suggestion that McCoy intended the stories to possess political or artistic value, the court could discern no such intent "within the murk of rape, incest, abuse, molestation, and vivid descriptions of the violations of children as composed within [McCoy's] work." Dkt. 171, at 12. And in any event, the court found, the record evidence does not "support a

finding that [McCoy's] purpose was artistic, scientific, or political." *Id.* To the contrary, the record "establishes a clear purpose to appeal to prurient interest, especially with prepubescent female children." *Id.*

McCoy contends that this analysis at the third stage of the *Miller* standard was erroneous. He contends (Br. 27-36) that (1) the record does not support a finding that the 18 stories were representative of all his stories collectively, and (2) in any event, it was the website—not his stories—that the court should have deemed his "work as a whole." He also contends (Br. 36-40) that the district court placed too much emphasis on his purpose in writing and posting the stories on the Internet. McCoy's arguments fall short.

### 1. The District Court Did Not Clearly Err When it Found that Eighteen of McCoy's Stories Were Representative of All the Stories Collectively

1.    The court's finding that the 18 stories were representative of all of McCoy's stories collectively is a finding of historical fact. *See ACLU v. Miami-Dade*, 557 F.3d at 1206 (historical facts "are facts about the who, what, where, when, and how of the controversy"). That finding is therefore subject to review for clear error. *Flanigan's Enters., Inc.*, 596 F.3d at 1276. This Court will find clear error only if, in light of the evidence, it is left with a definite and clear conviction that the district court has committed a mistake. *See, e.g.*, *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).

33

The district court's finding was well founded. McCoy's stories are highly repetitive and contain the same types of lewd and graphic descriptions of sexual conduct over and over again. *See generally* GX 3, 9, 11. Although McCoy contends (Br. 31-32) that the 18 stories are not representative of the stories as a whole because some of the other stories are substantially longer, the few very long stories—such as the longest, "Her Father's Daughter," *see* GX 3—are outliers, and at least one of the 18 stories ("Playing [A]dult [G]ames with Little Sister") is among the longer of McCoy's stories, *see* GX 5H. Moreover, even the longest stories, although slightly more drawn out, incessantly repeat the same lewd content. In those stories, like the book in *Kaplan*, "[w]hether one samples every 5th, 10th, or 20th page, beginning at any point or page at random, the content is unvarying." 413 U.S. at 117.[15]

McCoy argues (Br. 30-31) that the district court erred because it did not base its finding on a review of the stories themselves but rather on "the testimony provided at trial and the Defendant's own characterization of his stories." Dkt. 171, at 6. The district court stated, however, that it "carefully considered the facts at bar and the testimony and evidence presented at trial."

---

[15] McCoy also asserts (Br. 32) that "unlike many of [his] other pieces," the 18 stories "lack explanatory prologues or epilogues." To the contrary, three of the 18 stories do in fact contain substantial explanatory prologues. *See* GX 5E, 5N, 5R.

34

Dkt. 171, at 12. Moreover, even if the district court specifically relied on particular evidence in making its finding of fact, this Court "review[s] all of the evidence" when reviewing a finding for clear error. *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1137 (11th Cir. 2004) (internal citation and quotation marks omitted). That evidence, as described above, demonstrates that the 18 stories were in fact representative of McCoy's stories generally.

Moreover, the evidence specifically cited by the district court amply supported its finding. Agent Brant described the 18 stories and testified that the other stories he downloaded from McCoy's website were similar and also described in graphic and explicit detail the sexual abuse, rape, murder, and torture of young children. 1/12/2010 Tr. 30-39. McCoy himself described the stories as mostly involving incest, pedophilia, and pregnancy. GX 1, at 1. The district court also heard extensive testimony from McCoy's expert, Richardson, in which he discussed stories not included among the 18 selected by the government. *See, e.g.*, 1/12/2010 Tr. 178-79, 187; 1/13/2010 Tr. 11-12, 16-17. Although Richardson purportedly discerned distinctions between the 18 stories and all the rest, he nonetheless confirmed that all the stories "focus[ed] on one or two standard plots." 1/13/2010 Tr. 4.

2.    McCoy contends (Br. 33-36) that the "work" the district court was required to consider "as a whole" when applying the *Miller* third prong was his

35

website, not his stories. As McCoy acknowledges, however, in the district court he took the position that "his 'work as a whole,' for purposes of the *Miller* test, consisted of every last one of the stories [Agent] Brant downloaded in the Middle District [of Georgia]." Br. 28; *see* 1/12/2010 Tr. 165 (defense opening statement) ("The defense expects the evidence to show that the body of work submitted by the government as an exhibit in this case, some 240 stories, which are basically the memorialization [sic] of his fictional musings, that these things taken as a whole, in fact, do not lack serious literary, artistic, or political value."); *see also* Dkt. 143, at 3-4; Dkt. 160, at 5; Dkt. 161, at 4.

McCoy has therefore waived the claim that his website was the "work as a whole" for purposes of the *Miller* test. "It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." *United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997) (internal quotation marks omitted). Waiver occurs where, as here, a party induces or invites the district court into making an alleged error. *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009). Invited error precludes appellate review. *Id.*

Even if this Court were to consider the claim forfeited, rather than waived, McCoy could not show he is entitled to relief on plain error review. Defining the "work as a whole" requires a contextual and factbound

36

determination. *See Ashcroft v. ACLU*, 535 U.S. at 593 (Kennedy, J., concurring) ("The notion of judging work as a whole is familiar in other media, but more difficult to define on the World Wide Web."); *United States v. Extreme Assocs., Inc.*, No. 03-0203, 2009 WL 113767, at *2 (E.D. Pa. Jan. 15, 2009) ("[W]e must view the context and manner in which the material has been created, packaged, and presented by the author to the intended audience in order to decide what the work 'as a whole' is for purposes of the *Miller* test."). Depending on the context, the "work as a whole" might be a magazine, rather than an individual article or photograph contained therein, *see Penthouse*, 610 F.2d at 1366-67; an individual movie recorded on a videotape along with other movies, *see United States v. Various Articles of Obscene Merchandise, Schedule No. 2098*, 536 F. Supp. 50, 53 (S.D.N.Y. 1981); or an individual video available for access on a website along with other videos, *see Extreme Assocs., Inc.*, 2009 WL 113767, at *2-*3. The district court did not commit clear or obvious error when it determined, in the particular circumstances of this case, that McCoy's stories collectively constituted the "work as a whole." *See, e.g.*, *United States v. Bacon*, 598 F.3d 772, 777 (11th Cir. 2010) (error must be "obvious and clear under current law").

McCoy also cannot show that he was prejudiced by the alleged error. The contents of the website were admitted into evidence and taken into

account by the district court when determining whether the stories were obscene. *See* Dkt. 171, at 7. And the contents of the website did not tend to support the defense but rather further supported the district court's obscenity finding. *Id.* The website showed, for example, that McCoy did not create the stories in a serious attempt at art but rather in an attempt to appeal to his and his audience's prurient interest in sex. *See infra* pp. 39-40. The outcome of the trial therefore would have been no different had the district court defined McCoy's "work as a whole" as his website.

## 2.    The District Court Did Not Err in Considering McCoy's Purpose in Creating and Disseminating the Stories

"Obscenity determinations often require analysis of the particular factual contexts in which the material at issue is created, promoted, and disseminated." *Adult Video Ass'n v. U.S. Dep't of Justice*, 71 F.3d 563, 568 (6th Cir. 1995); *see United States v. Various Articles of Obscene Merchandise, Schedule No. 1769*, 600 F.2d 394, 404 (2d Cir. 1979) (discussing "the use of context or circumstance as relevant to the determination of 'obscenity'"). The Supreme Court accordingly has "considered motivation relevant to the ultimate evaluation." *Pinkus v. United States*, 436 U.S. 293, 303 (1978). Evidence of intent to sexually gratify those who would find a work sexually arousing tends

to support a finding that a work lacks societal value, whereas evidence of intent to educate or edify cuts the other way. *See supra* pp. 23-24.

The district court was therefore correct to take into account McCoy's intent. And despite McCoy's arguments (Br. 37-38) to the contrary, there was ample support for the court's finding that McCoy had a "clear purpose to appeal to the prurient interest, especially with prepubescent female children." Dkt. 171, at 12. The contents of McCoy's website, for example, showed that McCoy's purpose in creating the stories was to gratify his and his audience's sexual desires. *See* GX 1. The website states that McCoy "started writing sex stories for his own enjoyment, and later started publishing them on the internet (in alt.sex.stories) when he found out that other people were interested in reading them." GX 1, at 1. Similarly, in the foreword to "Her Father's Daughter," McCoy's longest work, he explained that due to "censorship," bookstores no longer carried books about incest or "little children having sex" and so he "finally decided, that if no one was (or dared to) write the kind of story I wanted to read . . . then I would have to write it myself, if only for my own enjoyment." GX 3 (Foreword, "Her Father's Daughter"). As the Supreme Court has explained, "where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation at its face value." *Memoirs*, 383 U.S. at 420.

39

McCoy contends (Br. 38) that the district court treated his intent as dispositive and gave it precedence over the content of the stories. To the contrary, the court first "consider[ed] the material in question objectively as is required by law" but "simply [could not] find that *the content of* [McCoy's] works provide serious literary, artistic, politic[al], or scientific value." Dkt. 171, at 12 (emphasis added). Although the court separately determined that McCoy's purpose was to appeal to the prurient interest in sex, the court also found that McCoy's stories lack societal value even if it is assumed that his purpose was to "incite political discourse and provide artistic commentary." Dkt. 171, at 12.[16] The court's finding with respect to McCoy's purpose therefore was not necessary to the court's conclusion that McCoy's stories lack serious artistic, literary, or political value.

### 3.    The Alleged Errors in Applying the Third *Miller* Prong Do Not Support a New Trial or Remand to a Different District Judge

The district court, as explained above, properly applied the third prong of the *Miller* obscenity standard. But even if it is assumed that the district court

---

[16] The court reasoned that the content of McCoy's stories overwhelmed any intent McCoy may have had to create a work of artistic or political significance. Dkt. 171, at 12. The court did not—as McCoy erroneously contends (Br. 39)—hold that "McCoy's work *must* be obscene because of the 'murk' of its subject matter."

40

erred, the remedies sought by McCoy—a new trial and remand to a different district judge (Br. 36, 43)—are unwarranted.

If the Court were to conclude that the district court erred as alleged by McCoy, the Court should apply the third prong of the *Miller* standard on the basis of the record—in the manner the Court deems correct—and affirm the judgment of conviction. This procedure would be consistent with the requirements of harmless error review under Fed. R. Crim. P. 52, *see Pope*, 481 U.S. at 501-04 (remanding to Illinois Supreme Court to determine whether error in jury instruction regarding third prong of *Miller* standard was harmless), and with the requirement that the Court conduct an independent review to determine whether McCoy's work as a whole lacks serious artistic, literary, political, or scientific value, *see United States v. Groner*, 494 F.2d 499, 501 (5th Cir. 1974) ("We need not remand for a new trial because it is our duty to make an independent constitutional judgment on the facts of the case as to whether the material is constitutionally protected.") (internal citation and quotation marks omitted). As discussed above, *see supra* pp. 22-32, an independent review of the record establishes that McCoy's stories lack societal value.

The Court also has discretion to remand to the district court so that it may apply the third *Miller* prong consistent with direction from this Court. *See United States v. Pinner*, 561 F.2d 1203, 1206-07 (5th Cir. 1977) (after bench trial,

41

remand to district court for "specific findings" and "application of the proper legal principles"); *United States v. Farrell*, 126 F.3d 484, 491 (3d Cir. 1997) ("[W]e conclude that the appropriate course is to reverse the judgment of conviction and remand to provide an opportunity for the district judge who tried this case to review the existing record and make additional findings of fact."); *cf. United States v. Canady*, 126 F.3d 352, 364 (2d Cir. 1997) (in light of violation of public trial right at bench trial, rejecting new trial and ordering "remand to the district court to announce its decision in open court"). It would not be appropriate, however, for the district court to conduct a retrial. The errors as alleged by McCoy—in the manner in which the district court applied the third prong of the *Miller* standard—occurred after the trial proceedings, when the district court assessed the trial record, made findings, and returned a guilty verdict. McCoy accordingly does not suggest that the alleged errors affected the evidence that was introduced at trial or in any way affected the manner in which the trial was conducted, including the manner in which he pursued his defense. A retrial would therefore be redundant and a waste of judicial resources.

Finally, even if this Court were to remand for additional proceedings, reassignment to a different district judge would not be justified. McCoy acknowledges (Br. 36 n.5) that the district court has not acted "improperly, or

42

with bias." Absent bias, this Court will take the "extraordinary" step of ordering reassignment to another district judge only after considering three factors, *see United States v. Gupta*, 572 F.3d 878, 891 (11th Cir. 2009), none of which supports reassignment in this case. There is no basis to conclude that the district judge "would have difficulty putting his previous views and findings aside" or that "reassignment is appropriate to preserve the appearance of justice." *United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir. 1989) (per curiam). Moreover, the district court has already presided over a bench trial and extensive pre- and post-trial proceedings, and as a result, "reassignment would entail waste and duplication" that is entirely "out of proportion" to any gains that could feasibly be "realized from reassignment." *Id.*

## II. The Government's Focus On the Eighteen Stories Did Not Constructively Amend the Indictment

McCoy contends (Br. 40-43) that the district court's finding that 18 of his stories were representative of all his stories collectively constructively amended the indictment. McCoy's argument falls short.

### A. Standard of Review

This Court reviews *de novo* a preserved claim that the government or district court constructively amended the indictment. *See United States v. Gutierrez*, 745 F.3d 463, 473 (11th Cir. 2014).

43

**B.    Argument**

Under the Fifth Amendment, "a defendant can only be convicted for a crime charged in the indictment." *United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990). A constructive amendment of an indictment occurs, in violation of the Fifth Amendment, when the government (*e.g.*, through the presentation of evidence or argument) or the court (*e.g.*, through jury instructions) broadens the possible bases for conviction beyond what is contained in the indictment. *See United States v. Ward*, 486 F.3d 1212, 1226-27 (11th Cir. 2007); *United States v. Behety*, 32 F.3d 503, 508-09 (11th Cir. 1994). Underlying this doctrine is the principle that "'[i]t would be fundamentally unfair to convict a defendant on charges of which he had no notice.'" *Ward*, 486 F.3d at 1226 (quoting *Keller*, 916 F.2d at 633).

There was no constructive amendment of the indictment in this case. The indictment alleged that McCoy violated 18 U.S.C. § 1462 by using an interactive computer service (the Internet) for the transportation of "obscene stories," or "obscene 'fantasy' stories," which were downloaded from McCoy's websites "into the Middle District of Georgia and elsewhere." Dkt. 1, at 1-2. The government introduced into evidence all of the stories downloaded from McCoy's websites, *see* GX 3, 9, 11, and the district court found McCoy guilty only after concluding that those stories were obscene under the *Miller* standard,

44

*see* Dkt. 171, at 5-12. The evidence at trial and the district court's consideration of that evidence therefore corresponded fully with the allegations in the indictment.

McCoy contends (Br. 42-43) that there was a constructive amendment because the government requested a special verdict for 18 of McCoy's stories and, according to McCoy, the district court "effectively implemented that request." The district court explicitly denied the government's request for a special verdict, however, and merely made a factual finding that the 18 stories identified by the government were representative of McCoy's stories collectively. *See* Dkt. 171, at 3, 6. The district court ultimately concluded that all of McCoy's stories "taken as a whole" were obscene. *See* Dkt. 171, at 6, 8, 10. As a result, there was no deviation from the allegations in the indictment, let alone a deviation that broadened the possible bases for conviction.

There would have been no constructive amendment of the indictment even if the district court had granted the government's request and returned a special verdict on the 18 stories. An indictment is not constructively amended where the proof at trial is narrower than the allegations in the indictment. *United States v. Miller*, 471 U.S. 130, 138-40 (1985); *see United States v. Vernon*, 723 F.3d 1234, 1265-66 (11th Cir. 2013) ("[T]here is no fatal variance where a defendant is convicted upon evidence which tends to show a narrower scheme

45

than that contained in the indictment, provided that the narrower scheme is fully included within the indictment.") (internal citation and quotation marks omitted); *United States v. Bissell*, 866 F.2d 1343, 1356 (11th Cir. 1989) ("[I]t is not unconstitutional for a defendant to be tried on a narrower theory of misconduct than that alleged in the indictment."). A verdict based on a subset of the stories alleged in the indictment to be obscene would not have broadened the bases for conviction. *Cf. United States v. Brown*, 504 F.3d 99, 103 (D.C. Cir. 2007) (no constructive amendment where defendant charged with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g), and the jury was instructed it could find defendant guilty of either possessing the firearm or the ammunition). McCoy's claim of a constructive amendment has no merit.[17]

---

[17] McCoy has not raised and therefore has waived the claim that a prejudicial variance supports reversal. *See United States v. Prophete*, 522 Fed. Appx. 583, 587 n.1 (11th Cir. 2013) (unpublished). In any event, McCoy would not be able to establish a variance, let alone a prejudicial variance. "A variance, by contrast [to a constructive amendment], does not affect the elements of the crimes charged; rather, it occurs when the facts proved at trial differ from those alleged in the indictment." *United States v. Weissman*, 899 F.2d 1111, 1114 (11th Cir. 1990); *accord Ward*, 486 F.3d at 1226-27. As explained above, the proof at trial and the district court's verdict were fully consistent with the facts alleged in the indictment.

**CONCLUSION**

For the foregoing reasons, this Court should affirm the judgment of

conviction and sentence.

Respectfully submitted,

MICHAEL J. MOORE                      LESLIE R. CALDWELL
United States Attorney                Assistant Attorney General

JAMES N. CRANE                        DAVID A. O'NEIL
Assistant U.S. Attorney               Acting Deputy Assistant Attorney General
Middle District of Georgia
                                      /s/ John M. Pellettieri____
                                      JOHN M. PELLETTIERI
DAMON KING                            Attorney, Appellate Section
Principal Deputy Chief                Criminal Division
Child Exploitation and                U.S. Department of Justice
    Obscenity Section                 950 Pennsylvania Ave., N.W., Rm. 1260
Criminal Division                     Washington, D.C. 20530
U.S. Department of Justice            (202) 307-3766
                                      john.pellettieri@usdoj.gov


August 29, 2014

47

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE AND LENGTH LIMITATIONS

1.     This brief contains 11,035 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in proportionally spaced, 14-point serif typeface

using Microsoft Office Word 2007.

/s/ John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1260
Washington, D.C. 20530
(202) 307-3766

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I further certify that appellant's counsel, Martin J. Vogelbaum, Esq., is a registered CM/ECF user and that service will be accomplished by the CM/ECF system.

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1260
Washington, D.C. 20530
(202) 307-3766

49